2000 OK 96

Eddie **FOWLER** and Karen **Fowler**, individually and as husband and wife, Dennis Hawkins and Arlene Hawkins, individually and as husband and wife, Lee Smith and Marjorie Smith, individually and as husband and wife, and Orah Fowler, individually, Appellees,

v.

**LINCOLN COUNTY CONSERVATION DISTRICT, Appellant.**

No. 89,115.

Supreme Court of Oklahoma.

Dec. 12, 2000.

Ronald L. Walker, Connie M. Bryan, McKinney, Stringer & Webster, P.C., Oklahoma City, OK, for Appellant Lincoln County Conservation District.

Terry W. West, Bradley C. West, J. David Cawthon, The West Law Firm, Shawnee, OK, for Appellees.

LeAnne Burnett, Crowe and Dunlevy, Oklahoma City, OK, for Amicus National Watershed Coalition, National Association of Conservation Districts, and Oklahoma Association of Conservation Districts.

Dean A. Couch, Oklahoma Water Resources Board, Oklahoma City, OK, for Amicus Oklahoma Water Resources Board.

Jeannine Hale, Assistant Attorney General, Office of the Attorney General, Tulsa, OK, for Amicus State of Oklahoma.

HARGRAVE, V.C.J.

¶1 This issue in this contract case is whether the contract created a duty on the part of the Lincoln County Conservation District ("District") to maintain the condition of the lake created by its flood control easement and, if so, whether it breached that duty. The plaintiffs, adjacent landowners, sued District in contract for damages for failure to maintain the easement after blue-green algae formed on the District's flood control lake. The trial judge ruled that the easement contract was ambiguous, and permitted the introduction of parol evidence. The case was tried to a jury and judgment was rendered for the plaintiffs. District filed a motion for judgment notwithstanding the verdict/motion for new trial, both of which were denied by the trial judge. District appealed and District's motion to retain the case in this Court was granted. We affirm the jury verdict.

¶2 District sought to construct a dam on property then belonging to plaintiff Eddie Fowler's relatives. Eddie Fowler testified that the Fowlers did not want the dam or lake on their property, but were informed

that the land would be taken by condemnation otherwise. In September 1978, the plaintiffs, or their predecessors in title, granted District an easement for the construction, operation, maintenance and inspection of a floodwater retarding structure to be located on the described land, to be called the Quapaw Creek Watershed, Site No. 11.[1]

¶ 3 The easement provided for "the flowage of any waters in, over, upon or through such structure, and for the permanent storage and temporary detention of any waters that are impounded, stored or detained by such structure." The flood control structure was built in 1979. The easement provided that the landowners could use the land at any time, in any manner and for any purpose that did not interfere with the construction, operation, maintenance and inspection of the works of improvement. All of the plaintiffs used the lake for recreation and the plaintiffs Eddie and Karen Fowler used it for watering their dairy cattle.

¶ 4 According to the testimony of plaintiff Eddie Fowler, during the summer of 1991, he began to notice the presence of a greenish substance on the lake and then the health of some of his dairy cattle began to deteriorate. In October 1992, some of Eddie Fowler's

cattle died and he noticed decreased milk production from the dairy herd. Autopsies on two of Eddie Fowler's dairy cows were performed in December 1992. The autopsies indicated that the cattle died of nitrate poisoning of some kind.

¶ 5 Around the first of December, 1992, Mr. Fowler went to District's office and told them that there was a problem with the lake. He was advised that the board members would be contacted. When he heard nothing from the District, Mr. Fowler again went back to District, and District's director came out to the farm around Christmastime. Mr. Fowler showed the director the algae bloom on the lake and the director took some photographs. In January, 1993, Mr. Fowler received a letter from District's director that advised him to get a dairy specialist and a chemist to check the water and feed and have tests run. Mr. Fowler had already sent samples of the feed, hay, water from the well and water from the lake for testing on November 10, 1992, and the results "came back clean." In January of 1993, Mr. Fowler again pulled samples of hay feed and water for testing by two different laboratories and it "came back clean" again. Mr. Fowler then sent some samples of the algae "bloom" to

1. The contract is styled "Construction and Impoundment" and provides:
   "For and in consideration of One Dollar ($1.00) and other good and valuable considerations, the receipt whereof is hereby acknowledged, Grantor does hereby grant, bargain, sell, convey and release unto Lincoln County Conservation District of Chandler, Oklahoma, its successors and assigns, Grantee, *a permanent and perpetual easement in, over and upon the following described land* [legal description omitted] *for the purpose of or in connection with the construction, operation, maintenance, and inspection of a floodwater retarding structure to be located on the above described land;* and designated as site No. 11 in the plans on file in the office of the Grantee for the Quapaw Creek Watershed, for the flowage of any waters in, over, upon or through such structure; and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such structure.
   1. This easement includes the rights of ingress and egress at any time over and upon the above described land for the purpose of construction, the checking of operations, and the inspection and maintenance of the above described works of improvement.

   2. This easement includes the right of ingress and egress at any time to and from said works, over and across lands of the Grantor . . .
   3. There is reserved to the Grantor, his heirs and assigns, the rights and privileges to use the above described land at any time, in any manner and for any purpose that does not interfere with construction, operations, maintenance and inspection of the above described works of improvement.
   4. The rights and privileges herein granted are subject to all easements, rights of ways, mineral reservations or other rights now outstanding in third parties.
   5. The Grantee is responsible for operating and maintaining the above described works of improvement.
   6. Special Provisions.
   To have and to hold the aforesaid easement in, over, and upon the above described land of the Grantor, with all the rights, privileges and appurtenances thereto belonging or in anywise appertaining, unto the Grantee, its successors and assigns, forever . . . " (Emphasis added)

the Oklahoma Health Department's environmental lab and, although he received no written report, was told that blue-green algae had been identified.

¶ 6 Mr. Fowler called his state representative and a meeting was arranged at the farm on or about February 8, 1993, to determine what was wrong with the lake and what could be done about it. The county agent, along with representatives from the Corporation Commission, Conservation District, Conservation Commission, and Oklahoma Health Department's environmental lab attended the meeting. They viewed the lake, as well as an area where an oil pipeline had, according to Mr. Fowler, "blownout" in 1990, and had been cleaned up by the pipeline companies just before the meeting.

¶ 7 In March of 1993, Mr. Fowler sought legal advice. In July 1993, the algae bloom was sent to OSU for testing. The lab report from OSU revealed that the particular blue-green algae involved was microcystis and stated that "this algae should be considered hazardous to livestock." The report advised that "livestock and other animals should not be permitted access to this pond."[2] The report indicated that the pond water also contained a small amount of cyanide at less that 5 parts per million, a level that should not present a hazard to livestock. The report stated that the nitrate level was less than 5 parts per million, which was not toxicologically significant. On November 3, 1993, Mr. Fowler sold his dairy cattle. Mr. Fowler testified that 28 cows and 18 calves died from November 1992 until the cows were sold in November 1993.

¶ 8 Plaintiffs first sued District under the Governmental Tort Claims Act for negligence in failing to maintain the Quapaw Creek Watershed Lake Site No. 11. The District moved to dismiss on the grounds that it is a political subdivision and that no written notice of the claim was presented within one year after the claim arose, as required by Title 51 O.S. § 156. Plaintiffs then filed an *amended* petition alleging *breach of contract* against District for failing to maintain Lake Site No. 11 pursuant to the easement agreement. As a result of the alleged breach of contract, the Fowlers, Hawkins and Smiths alleged that they suffered economic losses and diminishment in the value of their properties around "this polluted watershed control lake" for which they sought recovery. Plaintiffs' third cause of action, for specific performance, sought an order requiring District to perform the proper maintenance as set out under its contract and to take whatever steps were necessary to restore the Quapaw Creek Watershed Lake to its original condition, or in the alternative, to remove the lake from the property.[3]

¶ 9 A previous judge in the case granted District's motion to dismiss for failure to state a claim. On motion to reconsider, the trial judge vacated his previous order. Subsequently, District moved for summary judgment and Plaintiffs moved to amend their petition in order to dismiss the pipeline companies, to add Orah Fowler as an additional plaintiff, and to add the Oklahoma Conservation Commission as a party defendant. The Oklahoma Conservation Commission moved to dismiss on the grounds that the court lacked jurisdiction over the Commission and because the petition failed to state a claim against the Commission. The trial judge

2. The evidence reflects that farm ponds may often develop algae that are not hazardous. Here, however, there was evidence that the algae that formed were hazardous to animals and that Mr. Fowler's livestock died after consumption of the pond's waters. Thus, the blue-green algae in this case were materially different from those which commonly occur.

3. Plaintiffs also sued Amoco Pipeline Company, Inc. and ARCO Pipeline Company, Inc., alleging negligent operation in the use and installation of their pipelines and equipment crossing plaintiffs' property, which resulted in pollution of the Fowlers' property, including the lake, and caused the deaths of Fowler's cattle, among other damages. Plaintiffs settled with Amoco and ARCO pipeline companies. District argued that it should be entitled to a set-off in the event that damages were awarded against it. The trial judge, after hearing arguments from counsel, denied the motion for set-off. Plaintiffs stated that they were unable to connect the oil leak to the blue green alga problem and they maintained that the damages were for pollution of the ground surface. The issue of set-off was not raised in District's motion for judgment notwithstanding the verdict/motion for new trial and is not before us on appeal.

granted the Conservation Commission's motion to dismiss and sustained the District's motion for summary judgment.

¶ 10 Plaintiffs appealed and the Court of Appeals, Division 4, affirmed the dismissal of Commission and reversed the grant of summary judgment in favor of District. The case was remanded to district court and proceeded to jury trial. The jury returned a verdict in favor of the plaintiffs.[4] The trial court denied District's motion for judgment notwithstanding the verdict/motion for new trial. District appealed and it's motion to retain was granted.

¶ 11 The case was presented and tried as a contract case. In its motion for judgment notwithstanding the verdict and motion for new trial, District, represented by the attorney general's office, requested the trial court to take judicial notice of federal laws and regulations pertinent to watershed districts that it claimed showed that District had no duty or responsibility to maintain water quality and that District did nothing to cause the problems with the water. The trial judge correctly noted that it was being asked to consider the case on an entirely different basis from that on which it was presented to the jury, with pages and pages of federal regulations and code law that never were part of the original trial.

¶ 12 District raises numerous issues on appeal, but the majority of those issues were not raised in its motion for judgment notwithstanding the verdict/motion for new trial.[5] We may not consider errors not raised in the motion for new trial.[6] We are left with only the issues raised by the post-trial motions. District offers numerous arguments in opposition to plaintiffs' claims, but the only issues raised in District's motion for

judgment NOV/motion for new trial were that the easement agreement did not require them to maintain the water quality in the flood control lake, that neither federal or state law places a duty on them to maintain water quality, and that plaintiffs have failed to show any action on the part of District that caused their alleged injuries. On appeal, District and *amici* argue strenuously that District had no authority or duty to perform abatement of pollution because other agencies have the responsibility for water quality in the state, and the federal Watershed Protection and Flood Prevention Act sets out the requirements for local organizations such as the District, and that law controls District's authority, and that District's actions were at all times in conformity with the law and the terms of the easement. They argued that the specific terms of the easement can be precisely described by examining the Watershed Protection Act and the Watershed Work Plan prepared by the federal government and local sponsors, pursuant to federal law.

¶ 13 The trial judge determined that the easement was ambiguous, and allowed admission of parol evidence to determine the intent of the parties. The jury, after reviewing the evidence and hearing testimony of the witnesses, determined that the easement placed a duty on District to maintain the water. The District has never disputed that it has a duty to maintain the floodwater retarding *structure*. The ambiguity in the contract concerned the meaning of "floodwater retarding structure." The District contended that the "structure" was the dam. Plaintiffs contended that it included the lake. We have reviewed the record and find that there was competent evidence on which the

---

4. The jury awarded damages as follows: to Eddie and Karen Fowler in the amount of $97,400.00; to Orah Fowler in the amount of $15,600 .00; to Dennis and Arlene Hawkins in the amount of $3,000.00; and to Lee and Marjorie Smith in the amount of $1,000.00.

5. Title 12 O.S.1991 § 698. A motion for judgment notwithstanding the verdict should be granted only if there has been no evidence presented by plaintiffs showing a right to recover. In making such a determination the court must accept as true all evidence and all reasonable

inferences favorable to the party against whom the motion is directed, and disregard any conflicting evidence that is favorable to the movant. *Joffe v. Vaughn*, 873 P.2d 299 (Okla.App.1993), citing *Ray v. Ridpath*, 145 Okla. 69, 291 P. 546 (1930).

6. Title 12 O.S.1991 § 991(b) provides that if a motion for new trial is filed and denied, the movant may not on appeal raise allegations of error available at the time of filing the motion but not therein asserted.

jury could find that the District's duties under the easement included the duty to maintain the water in the flood control structure. District's witness, Mr. Wornom, admitted that the lake itself was a floodwater-retarding structure.[7] The easement provided that it included maintenance of a floodwater retarding structure, for the flowage of any waters in, over, upon or through such structure; and for the permanent storage and temporary detention of any waters impounded, stored or detained by such structure. The jury interpreted the contract to mean that District's duty to maintain its easement included the water pooled by the floodwater retarding structure. The jury's finding of fact cannot be overturned where there is any competent evidence reasonably tending to support the findings.

■ ¶ 14 In breach of contract cases, the credibility of witnesses and the effect and weight to be given to their testimony are questions of fact to be determined by the trier of facts and are not questions of law for this Court on appeal. *Robert L. Wheeler, Inc. v. Scott,* 1991 OK 95, 818 P.2d 475 (1991). Findings of fact by the jury will not be disturbed on appeal where there is any competent evidence reasonably tending to support the findings. The only question concerning the sufficiency of the evidence is whether there is any competent evidence to sustain the verdict. *Park v. Security Bank & Trust Co.,* 1973 OK 72, 512 P.2d 113, 118 (1973).

■ ¶ 15 In the case at bar, it was for the jury to determine whether the easement contract required the District to maintain the water quality of the lake formed by creation of the floodwater retarding structure. Where the meaning of an ambiguous written contract is in dispute, evidence of extrinsic facts and circumstances throwing light on the intention of the parties is admissible, and construction of such contract becomes a mixed question of law and fact, and is for jury determination under proper instruc-

tions. *Brogden v. Perryman,* 176 Okla. 505, 56 P.2d 398 (1936).

■ ¶ 16 The trial judge ruled that the contract was ambiguous and allowed parol evidence to be admitted. The jury found that the contract required the District to maintain the easement, including the water. We cannot find that the trial court abused its discretion in allowing parol evidence where the plaintiff Fowler had testified that representations were made in consideration of signing the easement that the District was going to make a nice lake for them and that they would "take care of it." Plaintiffs showed that they made demand on District to begin maintenance of its easement and that District did not do so. It was for the jury to determine whether any action or inaction on the part of District caused the plaintiffs' injuries. The jury found, based on the evidence presented, that the District's actions or inactions caused the plaintiffs' injuries and awarded damages for breach of the contract.

■ ¶ 17 Damages claimed for breach of contract cannot be recovered unless they are clearly ascertainable, both in their nature and origin, and it must be made to appear that they are the natural and proximate consequence of the breach of the contract and not speculative and contingent. *American Ins. Co. of Newark, N.J. v. Blake,* 173 Okla. 598, 49 P.2d 506 (1935). The plaintiff's witness on the amount of damages was a former real estate agent, who valued the diminution in value of the Fowler's property at $88,887.00, based on a current value of $400 per acre due to the polluted lake. The diminution calculated for the Hawkins was $11,652, and $1,047 for the Smiths. As to evidence for loss of cattle that died, Fowler testified that he lost 28 cows which had a value of $1100.00 each, evidenced by his cost to replace some of the herd. The loss occasioned by having to sell the rest of the dairy cows in their unsuitable condition was calculated at $45,075. A bill of sale from the Perkins Livestock Auction was entered into evidence.

---

7. Record, p. 280. [Q.... Also, you talked about floodwater retarding structure. A. Right. Q: Now, would you agree with me that a floodwater retarding structure is a lake? A. Right; Lake Eufaula, Lake Gibson. Q: And the lake as a whole includes the water in the lake, doesn't it? A: That includes it all.]

The 75 dairy cows were sold as is for $499.00 each. Fowler testified earlier that same year he had purchased 15 cows at $1100.00 each. The jury awarded each of the plaintiffs less than the amounts claimed as damages.

¶ 18 Broad discretion is given to the jury to determine the amount of damages. In *Stekoll v. Prevett,* 359 P.2d 579, 581 (Okla. 1961), the sole evidence of damage to plaintiff's property was testimony by the plaintiff that he was familiar with land values in the vicinity, and that the value of his 37 acres had been $60 per acre before release of the salt water, and that it had been reduced to at least one-half its value since the salt water flowed over it. The jury awarded plaintiff an amount less than that sought. We said that plaintiff's testimony was sufficient evidence as to market value before and after the damage so as to constitute proof of fair market value immediately before and after the injury. In *Bane v. Anderson, Bryant & Co.,* 786 P.2d 1230, 1236 (Okla.1989), we said that where the amount of the verdict is within the limits of the evidence, we will not invade the jury's province and substitute our judgment as a fact-finding tribunal. In the case at bar, there was competent evidence, given by the plaintiffs and their witness, on which the jury could find for the plaintiffs in the amounts awarded.

¶ 19 We find that plaintiffs presented sufficient evidence on which to base the existence of a duty on the part of District, and the breach of that duty. We will not substitute our judgment on the facts for that of the jury. Having reviewed the record and determined that the jury's verdict is based on competent evidence, we find that the judgment should be affirmed.

**AFFIRMED.**

¶ 20 HODGES, LAVENDER, OPALA, KAUGER, WATT, BOUDREAU, JJ., concur.

¶ 21 SUMMERS, C.J., WINCHESTER, J., dissent.