**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

OTIS ELEVATOR COMPANY,

      Plaintiff - Appellant,

v.

No. 04-6327

MIDLAND RED OAK REALTY,
INC.; MRO PROPERTIES, INC. and
KNOX GLASS COMPANY,

      Defendants - Appellees.

---

**Appeal from the United States District Court**
**for the District of W.D. Oklahoma**
**(D.C. No. CIV-03-384-L)**

---

Stacey Haws Felkner (Robert E. Manchester with her on the briefs) of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Robert W. Nelson (Derrick T. DeWitt with him on the briefs) of Whitten, Nelson, McGuire, Terry & Roselius, and Daniel K. Zorn (Stephen R. Palmer with him on the briefs) of Colins, Zorn & Wagner, Oklahoma City, Oklahoma, for Defendants - Appellants.

---

Before **BRISCOE, ANDERSON** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

On August 26, 1999, Defendant Knox Glass Company (Knox), with the assistance of Plaintiff Otis Elevator Company (Otis), attempted to transport a large piece of glass on top of an elevator car ("a car top move") in a building owned and managed by MRO Southwest (MRO).[1] During the transport, the glass broke, injuring Raymond Atkinson, a Knox employee. Atkinson sued Otis, claiming its negligence caused his injuries. Otis settled with Atkinson for $425,000. On March 18, 2003, Otis filed the instant lawsuit seeking indemnity from Knox and MRO in the amount of the settlement plus the costs and attorney fees Otis incurred in defending the Atkinson lawsuit. Its indemnity claim was based on a written indemnity provision contained in a "Repair Order" which Knox and MRO employees signed immediately prior to the car top move. The district court concluded the indemnity provision did not apply to the car top move and awarded judgment in favor of Knox and MRO. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings consistent with this opinion.

I. Factual Background

On August 26, 1999, Knox was scheduled to deliver a large thin piece of glass

---

[1] In its complaint, Otis alleged Midland Red Oak Realty and MRO Properties were the owners of the building and named these entities as defendants. According to the deposition testimony of James Wesley Tune, the Vice President and Secretary of Midland Red Oak Realty, the building is owned by MRO Southwest. No formal request for substitution was ever made in the district court. Nevertheless, we will refer to the owner of the building as MRO Southwest (MRO).

to the Oklahoma Society of CPA's, a tenant on the Ninth Floor of a building located at 50 Penn Place in Oklahoma City, Oklahoma.[2] The building was owned by MRO. Because the glass was too large for the elevator car, Knox planned to deliver it on top of the car. Otis was called to assist with the move.[3]

On the morning of August 26, 1999, four Knox employees, Jess Hunt, Ray Atkinson, David Brown and Bill Hunt, arrived at 50 Penn Place with the glass. A few minutes later, they were met by two Otis employees, Steve Newport and Jeff Williams. Upon arrival, Newport presented a "Repair Order" to Jess Hunt and Raymond White, an MRO employee and the building's Chief of Security. In addition to identifying the customer's address and the equipment's location, manufacturer and machine number, the Repair Order contained the following language:

> Make the repairs described below to equipment indicated above, at Otis' customary billing prices, for account of the undersigned, subject exclusively to the provisions on the reverse side hereof:
>
> The undersigned hereby assumes complete responsibility for, and agrees

---

[2] The sheet of glass, which was not crated or framed, was 10' X 5' and less than a quarter of an inch thick. It was annealed glass which, when broken, breaks into large pieces. In comparison, safety glass is hardened glass and breaks into small pieces.

[3] At the time of the car top move, Otis apparently had a lease with MRO to maintain and operate the elevators at 50 Penn Place. In its brief, Otis alleges it is not required to be present during a car top move and assists in such moves as a service to its customers. The only support provided for this claim is the fact another elevator company assisted Knox in moving the replacement glass to the Oklahoma Society of CPA's after the accident in this case.

-3-

to indemnify and save harmless Otis Elevator Company, its agents and employees from any and all damages or claims for damages for which they or any of them may sustain by reason of injury or death to persons or damage to property growing out of or connected with the performance of the work under this order whether caused by the negligence of Otis Elevator Company, its agents or employees or otherwise.[4]

(R. Vol. I at 107.) Newport did not explain the indemnity provision to either Jess Hunt or White; he merely informed them the Repair Order needed to be signed. Both Hunt and White signed the Repair Order without reading it.[5]

Subsequently, the glass was loaded on top of the elevator car. Atkinson and Bill Hunt, accompanied by Newport and Williams, rode on top of the elevator car with the glass, while Jess Hunt and Brown rode another elevator car to the Ninth

---

[4] Alan Brann, Otis' maintenance supervisor, testified Otis uses the Repair Order containing the indemnification agreement exclusively for car top moves.

[5] The day before the car top move, Jess Hunt informed Danny Knox, Knox's owner, that Knox would need to sign a repair order. Danny Knox authorized Jess Hunt to sign it. It is unclear whether Danny Knox knew the repair order would contain an indemnity provision. However, Jess Hunt testified every time he performed a car top move, he was asked to sign a similar document. He believed the indemnity provision meant "nobody's responsible for nothing." (R. Vol. IV at 922.)

Ben Bynum, an MRO employee and the manager of 50 Penn Place, testified he was informed before the move that an indemnification agreement would need to be signed. However, he never saw the Repair Order until his deposition in the instant lawsuit and never authorized anyone to sign the agreement on MRO's behalf, including White. MRO also claims White, as the building's Chief of Security, lacked authority to bind MRO. Otis argues White had the authority to bind MRO and MRO conceded as much in the parties' joint status report. Otis further alleges an MRO employee signed a similar repair order dated June 10, 1999, when Otis assisted in moving a table on top of an elevator car at 50 Penn Place. That repair order was signed by James Bath, Receiving Clerk. Bynum testified he did not know Bath and 50 Penn Place did not have a receiving clerk.

Floor.  Newport and Williams stopped the elevator car with the glass several feet below the Ninth Floor so the glass could be removed.  Williams stepped from the top of the elevator on to the Ninth Floor.  Newport, however, hoisted himself out. The glass broke and a shard of glass hit Atkinson's right arm, almost severing it.[6] According to the Knox employees on scene, Newport kicked the glass as he was hoisting himself out of the elevator shaft, causing it to break.  Newport denies kicking the glass.  Williams testified he did not see Newport kick the glass and believed the glass was broken when Bill Hunt pulled on the glass and attempted to straighten it.  However, he conceded Newport could have kicked the glass.

On July 17, 2001, Atkinson sued Otis in Oklahoma state court for negligence. A settlement conference was held on August 20, 2001; no settlement was reached. On March 15, 2002, Otis removed the case to federal court.  On December 12, 2002, Otis drafted letters to Knox and MRO, describing the facts of the case and demanding they defend and indemnify Otis under the indemnity provision contained within the Repair Order.[7]  Otis also requested their participation in a mediation scheduled for December 23, 2002.  Otis warned Knox and MRO that if they refused to accept its demand for indemnity or the tender of its defense, it intended to

---

[6] Despite two surgeries and physical therapy, Atkinson (who is right-handed) has only limited use of his right hand.

[7] In these letters, Otis stated Atkinson's medical expenses and lost wages totaled $24,406.33 and $3,744.00, respectively.  Subsequently, in Otis' lawsuit against Knox and MRO, Otis clarified Atkinson's medical expenses were $58,432.71.

proceed with the mediation and make every effort to settle with Atkinson. Otis mailed these letters on December 16 or 18, 2002; Knox and MRO received them on December 20, 2002. On that date, MRO drafted a letter to Otis, denying liability under the Repair Order's indemnity provision and informing Otis it would not attend the settlement conference or assume Otis' defense. It also questioned Otis' failure to provide notice sooner, given that the Atkinson lawsuit had commenced seventeen months earlier. Upon its receipt of the letter, Knox forwarded it to its insurance company, Zurich North America (Zurich). Zurich informed Otis that before it could respond to its request for defense and indemnity, it would need to determine whether it owed this coverage to Otis. It requested Otis to send it copies of pleadings and depositions and Atkinson's medical information. It requested this information be sent "[a]t a suitable time." (R. Vol. I at 226.) Neither Knox nor MRO attended the mediation and no settlement was reached. Consequently, on December 30, 2002, the district court placed the case on the February 2003 trial docket and later scheduled a settlement conference before a magistrate judge for January 28, 2003.

On January 16, 2003, Otis drafted a second letter to MRO again demanding indemnity and tendering its defense. It also informed MRO the case was set on the February 4, 2003 trial docket call and a settlement conference was scheduled for January 28, 2003. On January 20, 2003, Otis wrote a similar letter to Knox, who again forwarded it to Zurich. On January 23, 2003, Zurich confirmed receipt of the

-6-

demand and again requested information from Otis, including Atkinson's medical records and copies of pleadings and depositions, as well as any contracts between Otis and MRO. It also informed Otis that due to the untimeliness of the demand, it could not undertake Otis' defense. It further requested that Otis seek a continuance of the settlement conference and trial. On January 24, 2003, Otis responded to Zurich, stating it would mail the requested information via overnight mail. It also stated it would file an application for a continuance but doubted it would be granted. Otis filed a request for a continuance of the settlement conference and trial on January 27, 2003. That same day, a magistrate judge denied Otis' request for a continuance of the settlement conference and referred its request for a continuance of the trial to the district judge. Otis sent Zurich the information it requested on January 28, 2003, the date of the settlement conference. At the settlement conference, Otis settled with Atkinson for $425,000. Neither Knox nor MRO attended the settlement conference.[8]

## II. Procedural Background

On March 18, 2003, Otis filed the instant lawsuit against Knox and MRO (hereinafter Appellees) seeking indemnification pursuant to the indemnity provision contained within the Repair Order. On March 26, 2004, Otis filed a motion for

---

[8] In their combined appellate brief, Appellees allege that after MRO received Otis' January 2003 letter, it again requested documents from Otis. It provides no record citation for this assertion and this statement is unsupported by the record. Not only did MRO not request documents from Otis, it appears it never responded to Otis' January 2003 letter.

summary judgment arguing the indemnity agreement was valid and enforceable and Appellees' decision not to accept the tender of its defense or participate in the settlement negotiations statutorily precluded them from challenging the reasonableness of the Atkinson settlement or whether it was entered in good faith. On June 10, 2004, Appellees filed responses to Otis' motion, claiming summary judgment was inappropriate because questions of material fact existed regarding the validity of the indemnity agreement, the timeliness of Otis' notice to them of the Atkinson lawsuit, the reasonableness of the settlement and whether the settlement was made in good faith.[9] On August 17, 2004, the district court denied Otis' summary judgment motion. It found genuine issues of material fact as to the timeliness of the notice Otis provided to Appellees of the Atkinson lawsuit, the reasonableness of the settlement, and the validity of the indemnity provision. As to the indemnity provision, it questioned whether its presence in a Repair Order rendered it ambiguous, whether it resulted from an arm's-length transaction between parties of equal bargaining power and whether White had the authority to execute the indemnity agreement on MRO's behalf.

Thereafter, the parties filed trial briefs and a trial docket call and pretrial conference were held. At the trial docket call and pretrial conference, the parties agreed the validity of the indemnity provision in the Repair Order was a matter of

_____

[9] Knox also argued a question of fact existed as to whether the exclusivity provision of the Oklahoma Workers' Compensation Act precluded enforcement of the indemnity provision. This argument is not at issue on appeal.

law to be decided by the court.  Consequently, the court allowed the parties to supplement their trial briefs and to file responses.

After briefing, the district court issued another order, this time concluding the indemnity provision contained within the Repair Order did not cover Atkinson's injuries because they did not arise from repair work.  Specifically, it found the indemnity provision unambiguously applied to claims or damages "growing out of or connected with the performance of the work under this order."  (R. Vol. V at 1379 (quotations omitted).)  It determined "work under this order" meant repair work and not a car top move.  Because the indemnity provision was unambiguous, the court rejected Otis' reliance on extrinsic evidence that the parties knew the indemnity provision was intended to cover the car top move.  Alternatively, the district court ruled that if the indemnity agreement was ambiguous, it was unenforceable because indemnity agreements must be clear and unequivocal to be valid.  Therefore, the court entered judgment in Appellees' favor.  This appeal followed.

## III.  Discussion

Otis challenges the district court's conclusion that the indemnity provision contained within the Repair Order applies solely to repair work and not the car top move.  Assuming we agree and remand for trial, Otis requests we provide the district court guidance as to whether Otis must prove it was actually or only potentially liable to Atkinson in order to recover from Appellees under the

indemnity provision. We begin our analysis with the district court's decision that the indemnity provision does not apply to the car top move.

A. Indemnity Provision

Otis claims the district court erred in concluding the indemnity provision does not apply to the car top move. Otis agrees the provision is not ambiguous but asserts the court erred in limiting its application to repair work only. It contends the evidence clearly shows the parties intended the indemnity provision to apply to the car top move and the court erred in refusing to consider this evidence because Oklahoma law clearly permits a court to do so. Even assuming the indemnity provision is ambiguous, Otis claims such ambiguity does not render it invalid and unenforceable. While an indemnity agreement must clearly and unequivocally express an intent to exculpate an indemnitee for its own negligent acts, Otis asserts it need not refer specifically to those acts.

Appellees assert the indemnity provision is ambiguous because neither the Repair Order nor the indemnity agreement expressly refer to the car top move. Therefore, Appellees claim it is unenforceable because indemnity agreements must be clear, unambiguous and unequivocally identify the parties and the exact nature and extent of damages for which indemnity is sought. Even assuming the indemnity provision is not ambiguous, Appellees argue its scope must be determined from the four corners of the Repair Order, *i.e.*, resort to extrinsic evidence is prohibited. Under such circumstances, Otis would only be entitled to indemnity for the work

identified in the Repair Order. Because no such work is identified, Appellees argue Otis is not entitled to damages.

## 1. Standard of Review

"A federal court sitting in diversity . . . must apply the substantive law of the forum state, including its choice of law rules." *Vitkus v. Beatrice Co.*, 127 F.3d 936, 941 (10th Cir. 1997). This case was filed in the Western District of Oklahoma. In Oklahoma, "[t]he general rule is that a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public policy of the state where enforcement of the contract is sought." *Williams v. Shearson Lehman Bros., Inc.*, 917 P.2d 998, 1002 (Okla. Civ. App. 1995) (citing *Telex Corp. v. Hamilton*, 576 P.2d 767, 768 (Okla. 1978)). The Repair Order containing the indemnity provision was signed and executed in Oklahoma. Consequently, Oklahoma law applies and the parties do not contend otherwise. Determining whether a contract is ambiguous and interpretation of an unambiguous contract are questions of law in Oklahoma, which we review *de novo*. *Allison v. Bank One-Denver*, 289 F.3d 1223, 1233 (10th Cir. 2002); *Lewis v. Sac & Fox Tribe of Okla. Housing Auth.*, 896 P.2d 503, 514 (Okla. 1994). Interpretation of an ambiguous contract is a mixed question of law and fact and should be decided by the jury. *Fowler v. Lincoln County Conservation Dist.*, 15 P.3d 502, 507 (Okla. 2000).

2. Analysis

"An indemnity agreement is a valid agreement in Oklahoma, and is governed by statute." *Fretwell v. Prot. Alarm Co.*, 764 P.2d 149, 152 (Okla. 1988) (citing OKLA. STAT. tit. 15, §§ 421-430). An agreement indemnifying one from its own negligence will be strictly construed and must meet three conditions: "(1) the parties must express their intent to exculpate in unequivocally clear language; (2) the agreement must result from an arm's-length transaction between parties of equal bargaining power; and (3) the exculpation must not violate public policy." *United States v. Hardage*, 985 F.2d 1427, 1434 (10th Cir. 1993) (quotations omitted); *see Fretwell,* 764 P.2d at 152; *Kinkead v. W. Atlas Int'l, Inc.*, 894 P.2d 1123, 1127 (Okla. Civ. App. 1993). The dispute in this case concerns the first element, *i.e.*, whether the indemnity provision in the Repair Order unequivocally expresses the parties' intent to exculpate Otis for damages arising from the car top move.

The general rules of contract interpretation apply to the interpretation of an indemnity contract. *Wallace v. Sherwood Constr. Co.*, 877 P.2d 632, 634 (Okla. Civ. App. 1994). "[T]he cardinal rule in contract interpretation is to determine and give effect to the intent of the parties." *In re Kaufman*, 37 P.3d 845, 853 (Okla. 2001). Contrary to Otis' argument, "[i]f a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended. That intention cannot be divined from extrinsic evidence but must be gathered from a four-corners' examination of the instrument." *Pitco*

*Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 546 (Okla. 2003); *see also*

*GEICO Gen. Ins. Co. v. Nw. Pac. Indem. Co.*, 115 P.3d 856, 858 (Okla. 2005)

("Whether a contract is ambiguous and hence requires extrinsic evidence to clarify

the doubt is a question of law for the courts.") (quotations omitted); *Campbell v.*

*Indep. Sch. Dist. No. 01 of Okmulgee County, Okla.*, 77 P.3d 1034, 1039 (Okla.

2003) ("There is no need to resort to extrinsic evidence to ascertain a contract's

meaning where its language is clear and explicit. When a contract is reduced to

writing, the parties' intent is to be ascertained from the writing alone whenever

possible.").[10]

"A contract is ambiguous if it is reasonably susceptible to at least two

different constructions" such that "reasonably intelligent men[] on reading the

---

[10] We acknowledge there are Oklahoma and Tenth Circuit decisions applying Oklahoma law which appear to support Otis' argument that extrinsic evidence may be used to interpret an unambiguous contract. *See, e.g., First Nat'l Bank in Dallas v. Rozelle*, 493 F.2d 1196, 1200 (10th Cir. 1974) (concluding under Oklahoma law that an unambiguous contract may be explained by reference to the circumstances under which it was made without violating the parol evidence rule); *Amoco Prod. Co. v. Lindley*, 609 P.2d 733, 741-42 (Okla. 1980) ("[A] contract can be explained through the circumstances at the time of contracting and subsequently taking into consideration the subject matter thereof."). However, because we are sitting in diversity, we must apply the most recent statement of Oklahoma law by the Oklahoma Supreme Court. *Vitkus*, 127 F.3d at 941-42. *GEICO*, *Campbell* and *Pitco* contain the Oklahoma Supreme Court's most recent pronouncement on the issue: extrinsic evidence may not be used to interpret an unambiguous contract in Oklahoma. *See First Am. Kickapoo Operations v. Multimedia Games, Inc.*, 412 F.3d 1166, 1172 (10th Cir. 2005) (stating, but not deciding, the current state of Oklahoma law "appears to be that unambiguous contracts may be construed only in light of the language contained within the contracts' four corners").

contract would honestly differ as to its meaning." *Pitco Prod. Co.*, 63 P.3d at 545-46 & n.19. "The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous." *Id.* at 545. To determine whether a contract is ambiguous, a court must look to the language of the entire agreement, which must be "given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept." *Id.* at 546; *see* OKLA. STAT. tit. 15, § 160. If a contract is ambiguous, extrinsic evidence is admissible to resolve the ambiguity. *Fowler*, 15 P.3d at 507. However, such extrinsic evidence may not "vary, modify or contradict the written provision absent fraud, accident, or proof of mistake." *Dismuke v. Cseh*, 830 P.2d 188, 190 (Okla. 1992).

Extrinsic evidence is also admissible where the entire agreement between the parties is not reduced to writing, *i.e.*, the contract is incomplete. *Pitco Prod. Co.*, 63 P.3d at 546. In such circumstances, extrinsic evidence may be used to supply the part omitted, provided the evidence is not inconsistent with or repugnant to the contract's written terms. *Prudential Ins. Co. of Am. v. Glass*, 959 P.2d 586, 594 (Okla. 1998) ("[W]hen only part of an agreement is reduced to writing and the writing itself shows it is not a complete recitation of the parties' agreement, it is competent to prove by parol any separate agreement on which the document is silent and which is not inconsistent with its terms."); *Moore v. Emerson*, 325 P.2d 437, 441 (Okla. 1958) (same); *Nat'l Mineral Co. v. A.L. Sterne Co.*, 174 P.2d 922, 925

(Okla. 1946) (same). Whether a written contract is complete is determined from the contract itself. *Id.*

In this case, the district court found the indemnity provision in the Repair Order, specifically the phrase "work under this order" unambiguous and applied to repair work only. We agree the phrase "work under this order" *by itself* is not necessarily ambiguous. The plain and ordinary meaning of the phrase "work under this order" means just that—the work performed pursuant to the order, whether repair work or another type of work. However, because the phrase appears on a Repair Order, it arguably could be interpreted as limited to repair work. Because the phrase is susceptible to two different interpretations, it is ambiguous. The indemnity provision/Repair Order is also incomplete. While the indemnity provision applies to damages or claims for damages "growing out of or connected with the performance of the work under this order," no work is described within the provision or the Repair Order. In fact, the indemnity provision appears in the space designated in the Repair Order for such description. Whether the indemnity provision/Repair Order is viewed as ambiguous and/or incomplete, extrinsic evidence is admissible to explain it. The extrinsic evidence in this case, which is undisputed, shows that the phrase "work under this order" was the car top move. The Repair Order was presented and signed in connection with the car top move. The only activity occurring on August 26, 1999, involving the elevator described in the Repair Order was the car top move; no repairs were performed or anticipated.

-15-

This evidence is neither inconsistent with nor repugnant to the terms of the indemnity provision/Repair Order. Considering this evidence, it is clear the title "Repair Order" is a misnomer.[11]

The fact the indemnity provision/Repair Order is ambiguous and/or incomplete does not render the indemnity provision unenforceable. "Although an indemnification agreement must clearly and unequivocally express an intent to exculpate the indemnitee for its own acts, it need not specifically refer to those acts in order to achieve that result." *Hardage*, 985 F.2d at 1434. Thus, it is the intent to exculpate a party for its own negligence which must be clear and unambiguous, not the entire indemnity provision or the form on which it appears. *Fretwell*, 764 P.2d at 152-53; *Federated Rural Elec. Ins. Co.*, (Nos. 97,043, 97,051) 2002 WL 31041863, at *4 (Okla. Civ. App. July 12, 2002) (released for publication by Order of the Court of Civil Appeals of Oklahoma); *Kinkead*, 894 P.2d at 1128; *Wallace*,

---

[11] Although the parties have not addressed it, the backside of the Repair Order contains an integration clause:

> This agreement constitutes the entire understanding between the parties regarding the subject matter hereof and may not be modified by any terms on Customer's order form or any other document, and supersedes any prior written or oral communication relating to the same subject. Any amendment or modifications to this agreement shall not be binding upon either party unless agreed to in writing by an authorized representative of each party.

(R. Vol. I at 108.) This clause does not preclude consideration of the extrinsic evidence in this case because the evidence does not constitute a prior oral or written agreement between the parties and does not attempt to modify the indemnity provision/Repair Order but rather explain it.

-16-

877 P.2d at 634.  The indemnity provision in this case satisfies this requirement because it clearly and unambiguously exculpates Otis from "all damages or claims for damages [] which [Otis] may sustain by reason of injury or death to persons or damage to property growing out of or connected with the performance of the work under this order *whether caused by the negligence of Otis Elevator Company, its agents or employees or otherwise.*"[12]  (R. Vol. I at 107 (emphasis added)).

The cases relied upon by Appellees are not to the contrary.  In *Elsken v. Network Multi-Family Sec. Corp.,* the Northern District of Oklahoma certified three questions to the Oklahoma Supreme Court.  838 P.2d 1007 (Okla. 1992).  One of those questions was whether an indemnity agreement contained within a Residential Alarm Security Agreement was valid and enforceable.  The court concluded it was.  In doing so, it merely reiterated the general rule that an indemnity provision which seeks to indemnify one from its own negligence is enforceable where that intent is unequivocally clear from an examination of the contract.  *Id.* at 1011.  The indemnity provision in this case satisfies the general rule.

The other two cases, *Gulf, C & S. F. Ry. Co. v. Anderson*, 250 P. 500 (Okla. 1926), and *Schmidt v. United States*, 912 P.2d 871 (Okla. 1996), involved a release

---

[12] Analogously, the Oklahoma Supreme Court has allowed vague and ambiguous restrictive covenants/indentures to be explained by extrinsic evidence even though property restrictions, like indemnity agreements, are not favored by the law and will be strictly construed in favor of the unencumbered use of real property. *K&K Food Servs., Inc. v. S&H, Inc.*, 3 P.3d 705, 709-10 & n.11 (Okla. 2000); *Farmer v. Trepp*, 376 P.2d 596, 597-98 (Okla. 1962).

-17-

and exculpatory agreement, respectively. In *Anderson*, in exchange for money, the plaintiffs released the defendant from "any and all liability that has heretofore accrued or that may hereafter accrue . . . ." 250 P. at 500 (quotations omitted). Subsequently, the plaintiffs sought to recover from the defendant damages they sustained after entering into the release agreement. The Oklahoma Supreme Court found it unclear whether the consideration paid for the release agreement was for the damages plaintiffs had already sustained or whether it also covered future damages. It concluded a release agreement exempting a defendant from future damages resulting from his own negligence must be "clear, definite, and unambiguous, and show on its face the exact nature, character and extent of the damages which are within the contemplation of the minds of the contracting parties . . . ." *Id.* at 502. Because the release did not meet this standard, the court found the defendants could not rely on it as a defense to the plaintiffs' claims for those subsequent damages. *Id.* at 502-03.

In *Schmidt*, the plaintiff was injured in a commercial horseback riding accident when the defendant's employee frightened the horse she was riding. 912 P.2d 871. Before participating in the horseback riding, the plaintiff had signed a "Rental Riding Agreement" in which she agreed to exculpate the defendant from "any loss, damage or injury to my person or property that may occur from any cause whatsoever as a result of taking part in this activity." *Id.* at 872 (quotations and emphasis omitted). The question presented (which was certified to the Oklahoma

Supreme Court from the Western District of Oklahoma) was whether exculpatory agreements for personal injury are valid and enforceable in Oklahoma. The Oklahoma Supreme Court held that while such agreements are distasteful to the law, they are generally enforceable if (1) their language clearly and unambiguously evidences an intent to exonerate the would-be defendant from liability for the damages sought, (2) at the time they were executed there was no vast difference in bargaining power between the parties and (3) enforcement of them does not violate public policy. *Id.* at 874. Elaborating on the first prong, the court stated:

> A contractual provision which one party claims excuses it from liability for *in futuro* tortious acts or omissions must clearly and cogently (1) demonstrate an intent to relieve *that person* from fault and (2) describe the nature and extent of damages from which that party seeks to be relieved . . . . In short, both the identity of the tortfeasor to be released and the nature of the wrongful act--for which liability is sought to be imposed--must have been foreseen by, and fall fairly *within the contemplation of*, the parties. The clause must also identify the type and extent of damages covered--including those to occur *in futuro.*

Id. at 874.

Assuming the requirements of *Anderson* and *Schmidt* apply here, the indemnity provision contained within the Repair Order satisfies them. It clearly identifies the tortfeasor to be indemnified (Otis, its agents or employees) and the nature and extent of the damages from which Otis sought to be relieved (personal injury, death and damage to property growing out of or connected to the work performed under the Repair Order).

The district court erred in finding the indemnity provision in the Repair Order

did not apply to the injuries Atkinson sustained as a result of participating in the car top move and therefore did not satisfy the first *Hardage* requirement. The district court did not address the remaining *Hardage* requirements and the parties have not briefed them. Although Appellees have not seriously challenged whether the indemnity provision violates public policy, the parties dispute whether the indemnity provision resulted from an arm's-length transaction between parties of equal bargaining power and the district court found questions of material fact existed on this issue. Further, MRO and Otis dispute whether White had the authority to execute the indemnity provision on MRO's behalf. Consequently, we decline to address whether the indemnity provision satisfies the remaining *Hardage* requirements and remand these issues to the district court.

B. Actual or Potential Liability

In the event we remand this case for trial, Otis requests we provide guidance to the district court on whether Otis is required to prove it was actually or only potentially liable to Atkinson in order to recover from Appellees. It believes the district court would welcome such guidance because it was clearly concerned with trying a case that was settled.[13] Because the district court has not ruled on the

_____

[13] Otis cites to the following comments made by the district court at the September 8, 2004 trial docket call:

> The third issue in the case, which troubles me the most, is the one that it sounds like the parties are wanting to try a case that was settled and have a five-day trial over -- to see what this jury would decide, whether the settlement was proper or not, and I'm greatly concerned about

-20-

actual versus potential liability issue, Appellees claim this issue is not ripe for consideration and Otis lacks standing to raise it on appeal. They also argue that even if we find the indemnity provision meets the first *Hardage* requirement (the issue on appeal), the district court still needs to decide whether it satisfies the second and third requirements, a decision which could render the provision unenforceable. If the district court concludes the indemnity provision is unenforceable because it does not satisfy these additional requirements, Appellees argue there would be no need to decide Otis' burden of proof and therefore any guidance on the issue is premature.

We decline Otis' request to provide guidance to the district court on whether Otis is required to prove it was actually or only potentially liable to Atkinson in order to recover from Appellees. Issues remain concerning the validity of the indemnity agreement, in particular, the second *Hardage* requirement. MRO also contests White's authority to execute the agreement on its behalf. Resolution of these issues in favor of Appellees would obviate the need to decide Otis' burden of proof and would render any guidance we provide superfluous.

---

> trying a case that was settled and . . . whether that would even determine the reasonableness of it and whether a jury could determine. You know, what one jury may do, another jury may do the opposite, and I just wonder how binding it is for a jury to hear a trial that was settled and then come back with a decision about whether it was reasonable . . . .

(R. Vol. V at 1398.)

IV.  Conclusion

We REVERSE the district court's conclusion that the indemnity provision in the Repair Order did not apply to the August 26, 1999 car top move and we REMAND for further proceedings consistent with this opinion.  We DECLINE to provide guidance to the district court on whether Otis is required to prove it was actually or only potentially liable to Atkinson in order to recover from Appellees. Otis' Motion to Certify Questions of Oklahoma Law to the Oklahoma Supreme Court is DENIED.