FILED
United States Court of Appeals
Tenth Circuit

May 27, 2021

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

TRUEY DUANE HICKS,

    Plaintiff - Appellant,

v.

FG MINERALS, LLC,

    Defendant - Appellee,

and

SHEILA LEWIS,

    Defendant.

No. 20-7048
(D.C. No. 6:19-CV-00203-TDD)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HARTZ**, **PHILLIPS**, and **CARSON**, Circuit Judges.

_____

This appeal presents only one question:  Did a lease assignment require Defendant

FG Minerals LLC to pay Plaintiff Truey Duane Hicks a royalty on all sand processed by

a sand plant on a 160-acre tract of land owned by Sheila Lewis or only on processed sand

that had been mined from the Lewis property?  The United States District Court for the

Eastern District of Oklahoma granted Defendant's motion for judgment on the pleadings,

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

ruling that the assignment unambiguously required payment only on sand mined from the Lewis property. Plaintiff appeals. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.      BACKGROUND

### A.      Factual Background

Because this case comes before us on review of a judgment on the pleadings, we accept as true the well-pleaded allegations in Plaintiff's First Amended Complaint (the Complaint), the operative pleading. *See Sinclair Wyoming Ref. Co.* v. *A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021). In February 2005 Ms. Lewis entered into a renewable 25-year lease (the Lease) with Plaintiff and his business partner, Henry McCabe. Mr. McCabe, who is not an attorney, drafted the Lease by "us[ing] prior lease forms to piece together" the agreement. Aplt. App., Vol. I at 15. The purposes of the Lease included allowing Plaintiff and Mr. McCabe to mine and process silica sand on Ms. Lewis's land. In lieu of rent the lessees were to pay Ms. Lewis a production royalty of 30 cents per ton of sand mined from the property. Until the necessary infrastructure was installed and operations could commence, the lessees were to make various advance payments to Ms. Lewis, which would be deducted from her future royalties.

In May 2005 Plaintiff and Mr. McCabe assigned the Lease (the First Assignment) to Folsom Quartz Sand L.L.C., an entity owned by Mr. McCabe. Plaintiff and Mr. McCabe assigned all their rights and obligations under the Lease, but the First Assignment reserved for each man an overriding-royalty payment of 30 cents per ton on all sand "mined from the Property that is delivered or shipped to customers after

2

processing." *Id.* at 119. This overriding-royalty provision is the basis for the present dispute.

In December 2006 Folsom Quartz Sand assigned the Lease (the Second Assignment) to Defendant. Defendant assumed all obligations under the Lease and First Assignment, including payment of the overriding royalties. It thereafter installed the necessary infrastructure and started to mine and process silica sand on the Lewis property; and it paid Plaintiff the overriding royalties he was owed under the First Assignment. There were apparently no disputes before 2018, when Defendant installed a conveyor belt under the adjacent highway to transport substantial quantities of sand mined from properties near the Lewis land for processing. With its sand now being mined from other lands, Defendant stopped paying overriding royalties to Plaintiff.

## B. Procedural History

Plaintiff sued Defendant and Ms. Lewis in April 2019 in Oklahoma state court. Defendant removed the case to federal district court based on diversity jurisdiction. *See* 28 U.S.C. § 1441. The district court ruled that Ms. Lewis had been fraudulently joined, dismissed without prejudice the claims against her, and denied Plaintiff's motion to remand the case to state court for lack of diversity. Plaintiff does not challenge these rulings on appeal. The court ultimately dismissed under Fed. R. Civ. P. 12(b)(6) the remaining claims against Defendant: one for breach of contract and one for conspiracy. On appeal Plaintiff challenges the judgment but argues only that he stated a claim for breach of contract, presenting no additional arguments specifically directed at the conspiracy claim.

## II.     DISCUSSION

The parties agree that Oklahoma law governs their dispute.  We review de novo whether a contract is unambiguous and, if so, the meaning of the contract.  *See Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1101 (10th Cir. 2007).

"If language of a contract is clear and free of ambiguity the court is to interpret it as a matter of law, giving effect to the mutual intent of the parties at the time of contracting."  *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545 (Okla. 2003); *see also* Okla. Stat. tit. 15, § 154 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").  To determine ambiguity, we must consider the contract as a whole.  *See Pitco*, 63 P.3d at 545–46.  We should "not create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on [one] provision."  *Osprey L.L.C. v. Kelly-Moore Paint Co.*, 984 P.2d 194, 199 (Okla. 1999).  Ambiguity exists only if "the language is susceptible to two interpretations on its face from the standpoint of a reasonably prudent lay person, not from that of a lawyer."  *Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 869 (Okla. 2003) (ellipsis and internal quotation marks omitted); *see also Pitco*, 63 P.3d at 545 ("The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous.").  If a contract is unambiguous on its face, it provides "the only legitimate evidence of what the parties intended," and we cannot consider extrinsic evidence.  *Pitco*, 63 P.3d at 546; *see also Campbell v. Indep. Sch. Dist. No. 01 of Okmulgee Cnty.*, 77 P.3d 1034, 1039–40 (Okla. 2003).

4

The overriding royalty at issue on appeal was created by the First Assignment.  It entitled Plaintiff to "an overriding royalty interest of 30¢ per ton for whole grain commodity glass sand or aggregates for all silica sand or aggregates *mined from the Property* that is delivered or shipped to customers after processing . . . ." Aplt. App., Vol. I at 119 (emphasis added).[1]  The core dispute between the parties is the meaning of the word *Property*.  But the definition in the document itself is clear.  We place that definition in the context of the paragraph in which it appears:

> That HENRY F. McCABE and TRUEY DUANE HICKS (referred to herein collectively as the "Assignors"), for good and valuable consideration, the receipt and sufficiency of which is for all purposes acknowledged, do hereby assign, transfer, sell and convey unto FOLSOM

---

[1]  The overriding-royalty provision states:

> The Assignors hereby each reserve unto themselves and their respective heirs, successors or assigns and except from this conveyance the following overriding royalty interests:

> [An overriding-royalty interest to Mr. McCabe.]

> Unto Truey Duane Hicks an overriding royalty interest of 30¢ per ton for whole grain commodity glass sand or aggregates for all silica sand or aggregates mined from the Property that is delivered or shipped to customers after processing, computed on scale weights of common or other carrier used, payable in accordance with the provisions of Paragraph 3.C.(3) of the Lease.

Aplt. App., Vol. I at 119.  Paragraph 3.C.(3) of the Lease, entitled "Payment of Production Royalty," simply states that the advance payments made before production begins should be credited toward royalties and that each royalty should be paid by the 25th day of the month after shipment of the sand to purchasers. *Id.* at 114.

QUARTZ SAND L.L.C., an Oklahoma limited liability company (the "Assignee"), all of the Assignors' rights, title and interests in or to [the Lease], executed by Sheila Lewis as "Lessor" in favor of the Assignors as the lessees . . . , covering the following described lands and mineral interest:

> *The Northwest Quarter (NW¼) of Section Thirteen (13), Township Four (4) South, Range Eight (8) East of the Indian Base and Meridian, Johnston County, State of Oklahoma, containing 160 acres, more or less*

together with all the rights incident thereto, the personal property thereon, appurtenant thereto, or used or obtained in connection therewith (*the "Property"*)[.]

*Id.* at 118 (emphasis added). This provision unambiguously defines the *Property* as the land encompassing the above-emphasized description from the Public Land Survey System (PLSS)[2] and related personal property. And there is no dispute that what it describes is Ms. Lewis's 160 acres. No reasonable person would have any question about what is encompassed.

Plaintiff tries to create an ambiguity by reference to the definition of *Property* in the Lease. He asserts that "[t]he First Assignment incorporated all of the language of the Lease." Aplt. Br. at 35. True, the Lease and the First Assignment are closely related documents. But Plaintiff has not explained why the overriding royalty established by the First Assignment should track the royalty arrangement in the Lease. More importantly, nothing in the First Assignment explicitly incorporates any language from the Lease.

---

[2] The Public Land Survey System is a rectangular survey system established by the federal government and used predominately to survey and subdivide public lands in the western continental United States. *See Public Land Survey System*, Black's Law Dictionary (11th ed. 2019); *see also* 43 U.S.C. § 751.

6

Plaintiff contends that "[i]t was intended with the First Assignment, and the parties to the First Assignment intended and understood, that the overriding royalty would be based on the 'Property' as that term was used in the Lease and that meant more than just the land owned by [Ms.] Lewis." *Id.* at 40. If that were true, however, the parties to the First Assignment surely would not have bothered to provide a separate definition of *Property* in that assignment, at least not a definition contrary to the definition in the Lease. We cannot accept an assertion that is plainly contrary to the unambiguous language of the First Assignment. When contractual terms are unambiguous, they constitute "the only legitimate evidence of what the parties intended." *Pitco*, 63 P.3d at 546.

In any event, the definition of *Property* in the Lease is of no assistance to Plaintiff. We begin with the physical appearance of the Lease, because it is so suggestive in itself. First, the bottom of page one:

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which for all purposes is acknowledge, the Owner/Lessor hereby leases to McCabe-Hicks, and to its successors and assigns as provided herein, the following described lands and mineral interest situated in Johnston County, Oklahoma:

**Tract 1 Legal description**

NW ¼ of section 13, township 4 south, range 8 east, of the Indian Base and Meridan in Johnston County, Oklahoma, containing 160 acres, more or less

**Tract 2 Legal Description**

111

Aplt. App., Vol. I at 111. The top of page two appears as follows:

(sometimes referred to collectively herein as the "Property") for the purposes hereinafter described and with the exclusive right to prospect, mine and use said lands for the production, transportation, processing, storage, blending, sale and shipment of silica sand (including silica rock) and construction aggregates from the Property or any part thereof and from other lands operated by McCabe-Hicks and to do and place all things on, over, under and across the Property or other lands as in the judgment of McCabe-Hicks are necessary or appropriate for the same, including pipe, telephone and electric lines, roads, tracks, buildings, machinery, drilling rigs and other equipment, dumps, stock and waste piles, and one or more processing plants or facilities, subject to the following terms and provisions:

*Id.* at 112.

8

Plaintiff displays great creativity—creativity beyond what judges are permitted to indulge in—when he treats the language at the top of page two as a description of Tract 2. *See* Aplt. Br. at 12 (quoting ¶ 15 of the Complaint, which states that the "Tract 2 legal description" is the above language from the top of page two of the Lease); *id.* at 38 (similar). The absence of any language in the substantial empty space under the heading "Tract 2 Legal Description," and the clear difference in font between the legal description for Tract 1 and the language at the top of page two would dissuade any reasonable reader from thinking that the language on page two is the legal description for Tract 2. It is obvious that the space for a Tract 2 legal description is simply left blank, a not-unexpected result given that a nonattorney, Mr. McCabe, "used prior lease forms to piece together" the agreement, apparently a form that he could use in multiple transactions. Aplt. App., Vol. I at 15.

More fundamentally, the text on page two cannot be read as a legal description of property. Plaintiff emphasizes that this text mentions unspecified "other lands," and he argues that these lands are what Tract 2 encompasses. But that interpretation strips that term from its surrounding context. Read in context, it is clear that the text on page two is a continuation of the paragraph that preceded the "Tract 1 Legal description" heading on page one. The structure of the document language is: "For valuable consideration, the . . . Lessor hereby leases to [the lessees] . . . the following described lands . . . [spaces for legal descriptions] . . . for the purposes hereinafter described . . . ." The text on page two merely describes the purposes for which Plaintiff and Mr. McCabe may use the Lewis land. Plaintiff and Mr. McCabe are granted "the exclusive right to prospect, mine

9

and use said lands for the production, transportation, processing, [etc.] . . . of silica sand . . . from the Property or any part thereof *and from other lands* operated by McCabe [and Plaintiff]." *Id.* at 112 (emphasis added). The text further entitles Plaintiff and Mr. McCabe to "place all things on, over, under and across the Property or *other lands* as in the judgment of McCabe [and Plaintiff] are necessary or appropriate for the same, including pipe, telephone and electric lines, roads, [etc.] . . . ." *Id.* (emphasis added). Rather than including "other lands" within the meaning of "the Property," the passage, by speaking of "the Property or other lands," distinguishes "other lands" from the Property.

The definitional parenthetical at the top of page two—"(sometimes referred to collectively herein as the 'Property')"—provides another decisive blow to Plaintiff's argument. Again, the structure of the document undermines Plaintiff's interpretation. Starting with the opening language, the document states that Ms. Lewis "leases . . . the following described lands . . . : Tract 1 Legal description [followed by a legal description] . . . [and] Tract 2 Legal Description [followed by blank space] (sometimes referred to collectively herein as the 'Property') . . . ." The only sensible construction of this language is that the lands that are "sometimes referred to collectively" are those described by the preceding legal description(s), not those mentioned in the language that follows. No reasonable person would express the meaning advocated by Plaintiff with the language that appears in the Lease.

Finally, we note that several contractual provisions show that there was no "Tract 2." First, the Lease says that the $800 annual advances on Ms. Lewis's royalty payments were "computed on the basis of $5.00 per net mineral acre interest in Tracts 1 & 2." *Id.*

10

at 114. A simple calculation (800 ÷ 5 = 160) reveals that the two tracts together contained only 160 acres, precisely the size of Tract 1. Second, Ms. Lewis warranted title to "the Property as set forth in the descriptions of Tracts 1, & 2 above" and agreed that if she "at any time owns or is discovered to own less than the interests described above, the royalty provided [in the Lease] and the payment of such royalty shall be adjusted accordingly." *Id.* at 115. But Plaintiff has not alleged that Ms. Lewis owned any property beyond Tract 1, so she could hardly have warranted title to a Tract 2. Third, a recital in the Second Assignment (between Mr. McCabe's Folsom Quartz Sand and Defendant) says that through the Lease, "[Ms.] Lewis leased to McCabe [and Plaintiff] the following described lands and mineral interest," and then provides nothing more than the PLSS description of Ms. Lewis's 160-acre tract. *Id.* at 122.

In short, the term *Property* in the Lease and the First Assignment is clearly limited to property owned by Ms. Lewis. She could not lease property she did not own. By tying royalty payments to sand mined from the "Property," the First Assignment excluded royalties on sand mined elsewhere.

Plaintiff has raised two other arguments not based on either the First Assignment or the Lease. First, Plaintiff claims support in the Management Services Agreement (MSA) among Folsom Quartz Sand, Defendant, and Defendant's owner. The argument is barred because the First Assignment is not ambiguous. But we note that it is unpersuasive anyway. Although the MSA recognizes the *existence* of the overriding royalty—which is not in dispute—it says nothing about whether the royalty extends to sand mined from properties other than Ms. Lewis's. Nor does the MSA alter Plaintiff's

11

rights to the overriding royalty, whatever they might be. As alleged in the Complaint, he was neither "involved in" the MSA nor "claim[s] any benefits thereunder." *Id.* at 28. And the MSA states, "Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties [to the MSA], their respective permitted successors or assigns, if any, any rights, remedies, obligations or liabilities under or by reason of this Agreement." *Id.* at 107.

Second, Plaintiff alleges that Defendant paid overriding royalties for sand mined from other properties and processed on the Lewis land until 2018, when it installed a conveyor belt to transport substantial quantities of sand from nearby properties for processing. He says these earlier payments show that "all participants intended and understood that the pertinent instruments . . . created a scenario where the overriding royalty was based on more than just the 160-acre tract." Aplt. Br. at 41. If true, Plaintiff might have been able to seek some relief, such as reformation of the First Assignment. But he does not explain how this practice of Defendant created an ambiguity in the clear language of the assignment. As previously stated, under Oklahoma law if a contract is unambiguous on its face, the parties' "intention cannot be divined from extrinsic evidence but must be gathered from a four-corners' examination of the instrument." *Pitco*, 63 P.3d at 546. We therefore reject the argument.

## III.    CONCLUSION

We **AFFIRM** the district court's judgment.

Entered for the Court


Harris L Hartz
Circuit Judge