**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 8, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ESTATE OF LAVERNE ST. CLAIR,

      Defendant - Appellant.

No. 15-1181

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:11-CV-02857-RM-KLM)**
_____

Earl G. Rhodes, Earl G. Rhodes, LLC, Grand Junction, Colorado, appearing for Appellant.

Juan G. Villaseñor, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the briefs), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.
_____

Before **KELLY**, **MATHESON**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

In 2011, the federal government sued Laverne St. Clair, alleging he had trespassed on southwest Colorado land that is part of the San Juan National Forest.[1]  Following a bench trial, the district court held Mr. St. Clair liable for trespass, ordered him ejected, and imposed damages for alterations he had made upon the land.  Mr. St. Clair appeals.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

This case spans 140 years of land surveys and transfers.  We describe the system that has been used to survey the vast lands that became part of the United States, the factual history of this case, and how the district court adjudicated the parties' claims to 7.856 acres of disputed property.

### A.  *The Public Land Survey System*

In 1785, Thomas Jefferson and John Adams led a coalition in the Continental Congress to create a system for the government to survey public domain land.  U.S. Dep't of the Interior, Bureau of Land Mgmt., *A History of the Rectangular Survey System* 11 (1991).  The Land Ordinance of 1785 established the rectangular survey system, which was promptly used to survey public land in the original 13 colonies and the Northwest Territory.  *See id.* at 13-16.  Known as the Public Land Survey System, it is still used

---

[1] Mr. St. Clair passed away on December 26, 2015.  His wife, Beverly Ann St. Clair became the personal representative of his estate and moved this Court to substitute the estate of Laverne St. Clair for Mr. St. Clair as the appellant.  We granted her motion pursuant to Federal Rule of Appellate Procedure 43.  We continue to refer to Mr. St. Clair in this opinion, recognizing his estate is now the actual party to this case.

today.  *See id.*; 43 U.S.C. § 751; 2 George Cameron Coggins & Robert L. Glicksman, Public Natural Resources Law § 13:52 (2nd ed. 2012).

Under this system, the Bureau of Land Management ("BLM"), like its predecessors, commissions surveyors to divide federal land into "townships," which are 36-square-mile tracts of land.  Coggins & Glicksman, *supra*, at § 13:52; U.S. Dep't of the Interior, Bureau of Land Mgmt., *Manual of Surveying Instruction* 12 (2009) [hereinafter BLM Surveying Manual].  Surveyors then divide each township into 36 "sections"—one-square-mile (640 acres) tracts of land.  BLM Surveying Manual at 12.

A township with sections appears as follows:



Figure 1-2.  A regular township.

BLM Surveying Manual at 12.

Surveyors set boundaries for townships and sections by placing monuments on the ground and recording the location of these monuments in their field notes.  *See* 43 U.S.C.

§ 752. Monuments are placed to mark a given section's four corners and the half-way points between two corners—called "quarter corners." *Id.*; *see also* U.S. Dep't of the Interior, Bureau of Land Mgmt., *Glossary of BLM Surveying and Mapping Terms* 52 (1980) [hereinafter BLM Glossary]. From a surveyor's field notes, the BLM creates an official "plat," a map showing the boundaries of a township and its sections. 43 U.S.C. § 751; *see also* BLM Glossary at 49.

Based on an official plat, the government may issue land patents, essentially deeds, to convey land in a township or a section of a township to private citizens. *See* 2 Joyce Palomar, Patton and Palomar on Land Titles § 292 (3d ed.) ("A patent is a government conveyance just the same as a deed is a private conveyance."). Land patents describe the land conveyed either by reference to a fraction of the official plat—an "aliquot" description—or by reference to landmarks and adjoining properties—a "metes and bounds" description. *See* BLM Surveying Manual at 47; 1 Palomar, *supra*, § 126.

"[A] patent is the highest evidence of title, and is conclusive as against the Government, and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal." *United States v. Stone*, 69 U.S. (2 Wall.) 525, 535 (1864).

B. *Factual History*

1. **The Fahringer Survey and the Overocker Patent**

In 1876, shortly after Colorado achieved statehood, Walter H. Overocker laid claim to 160 acres of unsurveyed land in La Plata County, Colorado, north of Durango. In 1877, John Fahringer conducted a survey on behalf of the Department of the Interior,

General Land Office ("GLO"), the BLM's predecessor. The Fahringer survey noted Mr. Overocker's house but did not mark the boundaries of his claim.

Based on the Fahringer survey, the GLO created a plat of the township— "Township 36"— that included Mr. Overocker's claim.[2] Like all townships, Township 36 was divided into 36 sections. Mr. Overocker's claim was located in Section 33. Because Township 36 followed the typical pattern, Section 33 was the fourth section from the east boundary of Township 36. Section 33's southern boundary also formed part of the southern boundary of Township 36, which separated Township 36 from Township 35.

On March 20, 1880, Mr. Overocker purchased his claim from the government for $200.00. In 1881, the government issued a land patent to Mr. Overocker (the "Overocker patent"). The Overocker patent described the boundaries of Mr. Overocker's property in relation to the "Official Plat of the Survey of the said Lands." Aplt. App. at 1634. According to its aliquot description, the Overocker patent covered the "south half of the north-east quarter and the north half of the south-east quarter of section thirty three" of Township 36. Aplt. App. at 1634.[3]

---

[2] The complete name of Township 36 is Township 36 North, Range 9 West, New Mexico Principal Meridian, meaning it is a township located 36 townships north of the baseline for the New Mexico Principal Meridian and 9 townships west of the New Mexico Principal Meridian.

[3] The complete aliquot description is:

the south half of the north-east quarter and the north half of the south-east quarter of section thirty-three, in township thirty-six north, of range nine

Continued . . .

The Fahringer plat indicated Mr. Overocker's home in Section 33, but did not show the boundaries of his land:



Excerpt of Attachment 1 (Fahringer Plat) of the District Court's Order, Aplt. App. at 645.[4]

## 2. Clark Survey

In 1882, the GLO sent F.W. Gove to locate the monuments Mr. Fahringer had placed and to retrace his survey. Mr. Gove reported Mr. Fahringer "did not execute the

---

west of New Mexico Meridian, in Colorado, containing one hundred and sixty acres[,] according to the Official Plat of the Survey of the said Lands, returned to the General Land Office by the Surveyor General, which said Tract has been purchased by the said Walter H. Overocker.

Aplt. App. at 1634.

[4] This excerpt of a photocopy of the Fahringer plat and the other excerpts presented in this background section were introduced as exhibits at trial in the district court. The district court attached these exhibits to its findings of fact and conclusions of law.

survey in good faith," and the GLO found egregious errors in portions of Fahringer's surveys of Southern Colorado. Aplt. App. at 621, 814.

Later in 1882, the GLO sent Deputy Surveyor William Clark to investigate settlors' complaints regarding property boundaries in Township 36. Mr. Clark was unable to locate many of the monuments Mr. Fahringer was supposed to have placed.

But Mr. Clark did find a few corner monuments and conducted a new survey to establish new corners where Mr. Fahringer's corners were lost or never placed. Mr. Clark's new corners moved the boundary line between Township 35 and Township 36 north by approximately 850 feet of where Mr. Fahringer had set it. This shifted the southern boundary of Section 33 by approximately 850 feet north and some distance to the west. Mr. Clark did not alter the location of the northern boundary of Section 33.

3. **Storm Survey**

In 1888, the GLO sent a letter to Deputy Surveyor John A. Storm requesting his services in the "examination, retracement, establishment and connecting of lines" in the southern portion of Township 36 and the northern portion of Township 35, including the area where Mr. Overocker lived. Aplt. App. at 1590. The letter also charged Mr. Storm with protecting the rights of existing claims:

> As acquired rights must be respected and only the denomination of lands be changed according to the new survey, it is necessary to get as much data as possible for constructing a plat which shows the extent of existing claims and for calculating the amount of acres in the lots bordering such claims and the nearest section lines of the new survey.

Aplt. App. at 1595.

In Section 33, Mr. Storm was able to find only the east-quarter corner—the monument placed halfway between the northeast and southeast corners of Section 33. As an illustration, in the following diagram depicting a section, the east-quarter corner is the point indicated by the circle:



Diagram from the Government's Brief, Aplee. Br. at 5 (circle added).

No evidence of monuments marking any other corners of Section 33 could be found. The parties agree it is unlikely Mr. Fahringer placed any other monuments designating Section 33.

Cartographers prepared a plat of Township 36 based on Mr. Storm's field notes. The United States Surveyor General of Colorado approved the plat. In 1891, the GLO sent a letter to the United States Surveyor General of Colorado, stating the Fahringer survey had been "discarded" and requesting an amended plat. Several amended plats

were prepared, and the final plat based on the Storm survey was dated December 22, 1891 (the "Storm plat").

The Storm survey and the corresponding plats accepted and used the Clark corners marking the southern boundary of Section 33. The survey and plats also used the Fahringer east quarter-corner of Section 33. Mr. Storm set the northern boundary approximately where it was set under the Fahringer survey. He also set a new west quarter-corner.

As in the Clark survey, the Storm survey shifted the southern boundary of Section 33 by approximately 850 feet north, and the corners on that southern boundary were shifted to the west. The following diagram, a trial exhibit presented by the Government, shows the shifting of the corners of the southern boundary of Section 33, with the black diamonds indicating the new corners established by Mr. Clark and Mr. Storm:



Attachment 2 of the District Court's Order, Aplt. App. at 646.

The cartographer who prepared the Storm plat placed lot numbers on federal lands in Section 33. As indicated in the above diagram, Lot 1 and Lot 6 together formed a triangular wedge formed by the pivoting of the north-south centerline to the west. Mr. Overocker's land was marked as Lot 8 and Lot 9. The following is an excerpt of Section 33 from the Storm plat, showing the lot numbers:



Excerpt of Attachment 3 (Storm Plat) of the District Court's Order, Aplt. App. at 647.

4. **Subsequent History**

In 1893, the GLO directed local authorities to give notice to property owners whose land descriptions were affected by the Storm survey. These owners were allowed to amend the descriptions in their patents. In 1893, Mr. Overocker was no longer the owner of the land, and there is no evidence his successor-in-interest requested an amended patent.

In 1907, federal lands within Section 33 were made part of the San Juan National Forest. In 1925, the BLM issued an oil and gas permit in Lot 6. The BLM later issued oil and gas permits for Lot 6 in 1964 and 1977.

From 1893 until 1951, each time the property described in the Overocker patent was conveyed, the deeds used the original aliquot description—the "south half of the north-east quarter and the north half of the south-east quarter of section thirty three" of Township 36. Aplt. App. at 627, 1634.

In 1951, James and Lois Heidelberg conveyed the Overocker land to Angelo Dallabetta by warranty deed with the same aliquot description. In 1967, Mr. Dallabetta conveyed the land to Mr. St. Clair and his first wife by warranty deed, which described the land by metes and bounds. In 1976, Mr. St. Clair conveyed the property to himself and his second wife by warranty deed using the metes and bounds description.

In 1984, Mr. St. Clair purchased land from Mr. Dallabetta's estate that was not included in the Overocker patent description. The First National Bank represented Mr. Dallabetta's estate in the transaction. In conveying the land, the First National Bank also agreed to include a quit claim deed to Lot 6. A quit claim deed conveys to the grantee "only such interest as the grantor may have, if any." 4 Herbert Tiffany, Real Property § 959 (3d ed.). The quit claim deed referred to Lot 6 as a "Disputed Area" and described the boundaries of Lot 6 by metes and bounds. Aplt. App. at 628.

In 2000, Forest Service personnel discovered road construction, fence posts, brush hogging, and vegetation clearance in Lot 6.

## C. *Procedural History*

In 2011, the Government sued Mr. St. Clair for trespass on Lot 6. The complaint requested that he be ejected and pay for the damage he caused by constructing a road and making the other alterations to Lot 6 land.

At the subsequent bench trial, the Government's expert, Randy Bloom, BLM

Chief Cadastral Surveyor for Colorado, testified the Overocker patent, which was based

on the Fahringer survey, did not include Lot 6. He testified the Overocker land could be

located by reference to the Fahringer survey by starting at the east-quarter corner and

then going "due north . . . 20 chains, then due west, 40, then due south 40, . . . et cetera,"

but conceded this would not comply with the BLM Surveying Manual.[5] Aplt. App. at

809-10. In addition to Mr. Bloom's testimony, the Government also produced evidence

that Mr. Overocker used a similar method to mark the boundaries of his property in 1876.

Mr. St. Clair produced as experts two licensed professional surveyors, Zane

Wright and Donald Geddes, who opined that the Fahringer survey was a fiction and

therefore the aliquot description in the Overocker patent had to be considered with

reference to the later Clark and Storm surveys. Applying the description of the "south

half of the north-east quarter and the north half of the south-east quarter of section thirty

three" of Township 36 to the Clark and Storm surveys would, they said, define a parcel

that includes Lot 6. Aplt. App. at 629-30, 1634.

The district court issued findings of fact and conclusions of law. It determined the

Fahringer survey controlled the boundaries of the Overocker land:

> [T]he Fahringer plat, flawed and troublesome though it may be, was the
> sole and controlling plat at the time of issuance of the Overocker Patent,

[5] The 2009 BLM Surveying Manual notes that there have been multiple versions: 1855 (reprinted in 1871), 1881, 1890, 1894, 1902, 1930, 1947, 1973, and 2009. Mr. Bloom testified at trial the 1855 Manual would have applied to the Fahringer survey and the 1881 Manual would have controlled the Clark and Storm surveys.

and that the Fahringer plat governed the location of the Overocker Land. Subsequent surveys which altered the boundaries of Section 33 neither established, expanded nor contracted the western border of Overocker Land or the Overocker Patent. More specifically, the pivoting of the north-south centerline to the west along the southern boundary of Section 33 did not define or shift the western border of the Overocker Patent so as to include the Disputed Property.

Aplt. App. at 634.

The district court found the Overocker land could be located as follows:

The Court has examined, in detail, the Fahringer and Storm field notes and concludes that they are compatible with respect to the Overocker Land and consistent with the shape of the Overocker Land as shown on the Storm Plat (that is, a 160-acre square parcel of land whose borders run on cardinal coordinates).

. . . .

The evidence at trial clearly demonstrates that the Overocker Land could be located on the ground notwithstanding the fictitious nature of some of Fahringer's field work. Overocker himself had done so. One could simply start at the confirmed Fahringer east quarter-corner and go north 20 chains, then west 40 chains, then south 40 chains, then east 40 chains and then north 20 chains to establish the boundaries of a square parcel of land containing 160 acres. This parcel would be the equivalent of a "perfect" quarter section, as was the land covered by the Overocker Patent. It would be consistent with the placement of the Overocker Patent on the Storm Plat as Lots 8 and 9 in Section 33 and Lot 2 in Section 34. And most importantly, it would be wholly consistent with the original borders of Overocker's claim as laid out by Overocker himself in his Declaratory Notice of September of 1876—a 40 chain by 40 chain square plot due south of J.P. Lamb's land, containing 160 acres with boundaries generally tracking cardinal coordinates.

Aplt. App. at 633-34.[6]

_____

[6] A chain is a "unit of land measurement equal to 66 feet or 100 links." *Chain*, Black's Law Dictionary (10th ed. 2014).

The district court acknowledged the method it adopted to locate the Overocker land would not comply with the BLM Surveying Manual:

> The Court is aware that Mr. Bloom testified at trial in response to a hypothetical that it would be improper for a surveyor to locate the Overocker Patent on the ground simply by starting at the Fahringer east quarter-corner and proceeding to create a square in a manner similar to that described above. But, here, the Court [h]as been presented with more information tha[n] that provided to Mr. Bloom, including evidence that Overocker himself had set out the boundaries of his claim in an almost identical manner.

Aplt. App. at 634 n.4.

The district court finally determined that Lot 6 was not part of the Overocker land:

> Subsequent surveys which altered the boundaries of Section 33 neither established, expanded nor contracted the western border of Overocker Land or the Overocker Patent. More specifically, the pivoting of the north-south centerline to the west along the southern boundary of Section 33 did not define or shift the western border of the Overocker Patent so as to include the Disputed Property.

> . . . The United States is, and has continuously been, the owner of the Disputed Property. Neither Overocker nor any successor-in-interest prior to St. Clair asserted ownership of the Disputed Property.

Aplt. App. at 634.

The district court found Mr. St. Clair liable for trespass, ordered him ejected from Lot 6, and required him to pay $4,634.88 in damages to the Government.

## II. **DISCUSSION**

We affirm the district court's determination that the disputed property was not included in the Overocker patent because 1) the Fahringer survey and plat control the Overocker patent and 2) the land described in the Overocker patent does not include Lot 6.

- 15 -

## A. *Standard of Review*

The district court conducted a bench trial and entered findings of fact and conclusions of law under Fed. R. Civ. P. 52(a)(1). The court's legal conclusions are subject to de novo review. *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1030 (10th Cir. 2003). "The district court's findings of fact will not be disturbed on appeal unless they are clearly erroneous." *Sweeten v. U.S. Dep't of Agric. Forest Serv.*, 684 F.2d 679, 681 (10th Cir. 1982) (citing Fed. R. Civ. P. 52(a)). "A finding is clearly erroneous when the reviewing court has a definite and firm conviction that it is mistaken, even though there may be some evidence to support it." *Ryan v. Am. Nat. Energy Corp.*, 557 F.3d 1152, 1157 (10th Cir. 2009).

Whether a survey controls a patent is a legal question that we review de novo. *See United States v. Reimann*, 504 F.2d 135, 140 (10th Cir. 1974). "The actual location of a disputed boundary line is a question of fact," which we review for clear error. *Sweeten*, 684 F.2d at 681.

## B. *Analysis*

"[O]nce [a] patent has issued, the rights of patentees are fixed and the government has no power to interfere with these rights . . . ." *Reimann*, 504 F.2d at 138; *see also* 43 U.S.C. § 772 ("[N]o . . . resurvey or retracement shall be so executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands affected by such resurvey or retracement."); *Kean v. Calumet Canal & Improvement Co.*, 190 U.S. 452, 461 (1903) (holding that once a patent is issued, the rights it establishes are final and the

- 16 -

government has "no jurisdiction to intermeddle with them in the form of a second survey").

The issues on appeal are whether the district court correctly concluded (1) the Fahringer survey and plat control the Overocker patent and (2) the Overocker land does not include Lot 6.[7]  The parties agree that if the district court was correct on these points, Lot 6 belongs to the Government.

We affirm the district court's conclusions.

1. **The District Court Correctly Concluded the Fahringer Survey and Plat Control the Overocker Patent.**

Mr. St. Clair contests the district court's reliance on the Fahringer survey and plat to locate the Overocker land.  He provides no authority to suggest an erroneous or "discarded" survey can never control a land patent.  The only case either party provides that addresses the scenario of a patent being issued after a defective survey holds that the survey controls the patent.  *See Reimann*, 504 F.2d at 137, 141.

In *Reimann*, three surveys were taken of a township surrounded by national forest lands in Utah.  *Id.* at 137-38.  The first survey, conducted in 1891, covered the top half of the township.  *Id.*  A second survey in 1902 purported to cover the bottom half of the township, and also relocated the corners of several of the sections in the township.  *Id.*  In 1924, the GLO determined the 1902 survey to be "fatally defective" because the 1902 surveyor erroneously concluded the original corners in the 1891 township could not be

---

[7] Mr. St. Clair also does not otherwise challenge the district court's calculation of damages or order of ejectment.

found. *Id.* at 137. A third survey was conducted in 1924 that established the section corners approximately where they had been located in 1891. *Id.* at 137-38.

In 1907 and 1908, between the 1902 and the 1924 surveys, the United States issued land patents within this township. *Id.* at 140. The patents covered land described in relation to corners that were relocated from their original 1891 positions in the 1902 survey and then relocated again in the 1924 survey back to their original positions. *Id.* at 137-38. The relocation based on the 1924 survey reduced the size of the patented land compared to the 1902 survey. *Id.* The patentees' successor-in-interest sued the government, contending the 1902 survey should control because it was the official survey in existence when the government issued the patents. *Id.* We agreed. *Id.*

We noted that "[p]rior to title passing from the United States, it is undisputed that the Government has the power to survey and resurvey, establish and re-establish boundaries on its own lands." *Id.* at 138. Nonetheless, the GLO's conclusion that the 1902 survey was "fatally defective" was "irrelevant" because "once a patent has issued, the rights of patentees are fixed and the government has no power to interfere with these rights, as by a corrective resurvey." *Id.* The 1902 survey was "the controlling survey . . . insofar as the rights of the patentee whose patent was issued thereunder are concerned." *Id.* at 139. We remanded to the district court for a "determination of the boundaries of the controlling [1902] survey from the field notes of that survey, and such other evidence requisite to such determination." *Id.* at 141.

Like the 1902 survey in *Reimann*, the controlling survey in this case is the Fahringer survey, even if it was later determined to be defective or discarded, because it

- 18 -

was the last survey conducted before the Overocker patent issued. The Clark and Storm surveys provide some evidence of the original position of the corners delineating the boundaries of Section 33. *See United States v. Doyle*, 468 F.2d 633, 636 (10th Cir. 1972) ("The generally accepted rule is that a subsequent resurvey is evidence, although not conclusive evidence, of the location of the original line." (quotation and alteration omitted)).

Mr. St. Clair's contention that the district court erred in relying on the Fahringer survey therefore fails. It also fails as to the court's reliance on the Fahringer plat. An official plat "becomes as much a part of the grant or deed by which they are conveyed, and controls, so far as limits are concerned, as if such descriptive features were written out upon the face of the deed or the grant itself." *Cragin v. Powell*, 128 U.S. 691, 696 (1888); *see also Walton v. United States*, 415 F.2d 121, 123 (10th Cir. 1969) ("Where patented lands are designated by a phrase referring to the plats made from the surveys, the official plat becomes part of the instrument of conveyance."). The Fahringer plat, as the official plat referenced in the Overocker patent, became part of the patent description.

The Fahringer survey and plat therefore control the boundaries of the Overocker patent.

2. **The District Court Did Not Err in Determining the Overocker Land Did Not Include Lot 6.**

Mr. St. Clair disputes whether the district court could have determined the location of the Overocker land according to the Fahringer survey, contending there were "insufficient monuments on the ground." Aplt. Br. at 17. He relatedly argues the district

- 19 -

court improperly determined the location of the Overocker land by "start[ing] at the confirmed Fahringer east quarter-corner and go[ing] north 20 chains, then west 40 chains, then south 40 chains, then east 40 chains and then north 20 chains to establish the boundaries of a square parcel of land containing 160 acres." Aplt. App. at 630.

Mr. St. Clair's contentions rest largely on Mr. Bloom's testimony that the district court's adopted method would not comply with the BLM Surveying Manual. But Mr. St. Clair provides no authority suggesting a parcel of land is not locatable if the method used to locate it does not conform to the Manual.

In one of the few cases to discuss whether land described in a patent could be located, the Supreme Court determined a pragmatic approach may be used:

> [E]very entry should contain a description of the land so certain that subsequent locators might be able to ascertain it with precision, and locate the adjoining residuum. But that description is held to be sufficiently certain which, by due diligence, inquiry, and search in the neighbourhood, will enable a locator to find the land.

*Shipp v. Miller's Heirs*, 15 U.S. (2 Wheat.) 316, 322 (1817). We adopted a similar principle in *Reimann*. We indicated that when a patent refers to an official survey, a court may consider "the field notes of that survey, and such other evidence requisite to" determine the location of land described in the patent. *Reimann*, 504 F.2d at 141. Even if the district court's method of locating the Overocker land by reference to the Fahringer survey and plat does not comply with the BLM Surveying Manual, it does meet the *Shipp* standard because it would enable someone through "due diligence, inquiry, and search in the neighbourhood" to locate the Overocker land. *Shipp*, 15 U.S. at 322.

- 20 -

Significantly, and perhaps most conclusively, the Storm plat shows a 160-acre plot of land issued to Mr. Overocker that is consistent with where the district court located the Overocker land. GLO cartographers created the Storm plat, like the earlier Storm plats, from the field notes of both Mr. Clark and Mr. Storm. The GLO tasked Mr. Storm with protecting the rights of Mr. Overocker and other patentees whose lands Mr. Fahringer surveyed. The Storm plat therefore not only provides evidence of the original location of Mr. Overocker's land according to the Fahringer survey but shows the Overocker land is locatable according to the Fahringer survey. *See Doyle*, 468 F.2d at 636 ("The generally accepted rule is that a subsequent resurvey is evidence, although not conclusive evidence, of the location of the original line." (quotation and alteration omitted)). Moreover, as noted above, the Government produced evidence showing Mr. Overocker used a similar method to mark the boundaries of his land.

The district court correctly determined the location of the Overocker land according to the Fahringer survey and plat with the assistance of the Fahringer field notes, the Clark and Storm field notes and the Storm plats, and the method of "start[ing] at the confirmed Fahringer east quarter-corner and go north 20 chains, then west 40 chains, then south 40 chains, then east 40 chains and then north 20 chains to establish the boundaries of a square parcel of land containing 160 acres." Aplt. App. at 630.

Because the Overocker land was locatable according to the Fahringer survey, the description of the land in the Overocker patent does not refer to Section 33 as altered by the Clark and Storm surveys. Rather, it refers to Section 33 as it originally appeared in the Fahringer survey. The district court therefore did not err in concluding Lot 6 is not

part of the Overocker land.  It follows that the Government never passed title to Lot 6 to Mr. Overocker or any of his successors-in-interest, including Mr. St. Clair.

3.  **Mr. St. Clair's Reliance on *Cox v. Hart* Is Misplaced.**

Mr. St. Clair relies on *Cox v. Hart*, 260 U.S. 427 (1922), to argue the Overocker land should have been considered unsurveyed because it was not locatable before the Clark and Storm surveys.  He argues the Clark and Storm surveys should therefore control.  His reliance is misplaced.  *Cox* concerned whether a tract of land claimed by a settlor should be considered unsurveyed desert land—a requirement for the settlor's claim to the land.  260 U.S. at 429.  The Supreme Court concluded that, although the land had been originally surveyed in 1854, by the time the settlor laid claim to the land in 1909, "it was impossible to determine by reference to that [1854] survey in what section it was located." *Id.*  The Court held the surveyed land should be considered unsurveyed "when the survey originally approved and platted is subsequently annulled or abandoned, because the lines and marks established have become obliterated." *Id.* at 436.

In *Cox*, the markers of the original survey had been obliterated.  By contrast, the evidence in this case includes Mr. Fahringer's field notes and the east-quarter corner of Section 33 and other corners that Mr. Clark found in Township 36 where Mr. Fahringer placed and noted them.  Further, as explained above, it is possible to determine the location of the Overocker land as evidenced by Mr. Clark and Mr. Storm locating and protecting the Overocker land by reference to the Fahringer survey.

### III. CONCLUSION

We affirm the district court's judgment.