# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3360
_____

Southland Metals, Inc.

*Plaintiff - Appellee*

v.

American Castings, LLC

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville
_____

Submitted: June 10, 2015
Filed: August 25, 2015
_____

Before GRUENDER, MELLOY, and BENTON, Circuit Judges.
_____

MELLOY, Circuit Judge.

American Castings, LLC (American), terminated an exclusive sales contract with Southland Metals, Inc. (Southland), after Southland allegedly committed an incurable breach. Southland sued American, claiming American failed to comply with the termination procedure set out in the contract by not providing it with proper notice and an opportunity to cure. A jury found American breached the contract and awarded Southland approximately $3.8 million in damages. American moved for

judgment as a matter of law and for a new trial. The district court[1] denied a new trial and upheld the jury verdict. Because the evidence was sufficient to find American breached the contract and because the district court did not abuse its discretion by denying American's motion for a new trial, we affirm.

I

American is an Oklahoma-based foundry that manufactures iron castings for various customers, and Southland is an Arkansas-based sales company that sells castings, including the types American manufactures. After operating under a verbal agreement for a number of years, American and Southland entered into a written "Exclusive Representation Agreement" on November 15, 2010. At the time the parties signed the contract, American was aware Southland represented a number of other foundries, both domestically and internationally, and had existing business with those other foundries.

According to the contract, American "desire[d] representation with respect to the promotion and sale of products manufactured by [American] at Pryor, OK and as set forth on Schedule 'A&B', attached hereto (collectively, the 'Products')." And Southland "desire[d] to represent [American] with respect to the promotion and sale of the Products to the customers listed on Schedule 'A&B' (collectively, the 'Accounts')." Attached to the contract were three schedules: Schedule A listed "Active Accounts," customers with which American was then doing business; Schedule B listed "Potential Accounts"; and Schedule C listed "Foundries Grandfathered," those foundries with which Southland had existing relationships.

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

Despite the apparent specific definition of "Products" in the contract's recital and the recital's statement that Southland would represent American "with respect to the promotion and sale of products . . . as set forth on Schedule 'A&B', attached hereto," neither Schedule A nor B listed any products manufactured by American or defined "Products." Only one other schedule was attached, but it referred to other foundries, not products. Additionally, no section of the contract defined "Products." The term was nevertheless frequently used throughout the contract.

Under the contract, Southland had the exclusive right to sell American's "Products to the Accounts." Southland had a duty to devote adequate time and energy and "use its best efforts to solicit and promote the sale, specification, and use of the Products to the Accounts," but it had freedom to "select working hours and . . . [implement] its own marketing plan or system." Southland also had a duty to "[a]ct at all times in the appropriate manner so as not to disparage or injure the reputation or good standing of [American] or its Products." In exchange, the contract entitled Southland "ordinarily" to a 5% commission "on Products sold to Accounts."[2]

Southland was also subject to a confidentiality agreement. Southland was prohibited from "disclos[ing] any Confidential Information to any third party without the express written consent of [American], except as required to perform obligations under th[e contract] in furtherance of the business of [American]." Southland also could not use confidential information "for [Southland's] own benefit or otherwise appropriate the same for the use of any other person, firm or entity."

Due to the exclusive nature of the contract, American and Southland agreed to various noncompete clauses, set forth in Section 5 of the contract. Under the contract, Southland could not:

---

[2]Technically, the contract allowed different commissions in some instances, but the minor technicality is immaterial to the present appeal.

(a)     Conduct, engage in, have an interest in, or aid or assist any person or entity in engaging in the performance of activities which compete with services, sales or products of [American] or represent any product which competes with the Products;

(b)     Solicit, divert, take away or interfere with any business, customers, customs, trade or patronage of [American]; or . . .

(d)     Except for foundries that are grandfathered (see <u>Schedule</u> "C", attached hereto), represent any foundry that competes with [American] without written authorization of [American].

The contract also contained termination provisions. Either party could terminate the contract by giving the other 90 days' notice. In the event of a breach, the nonbreaching party could terminate the agreement after giving written notice and allowing the breaching party 30 days to cure the breach. If terminated at will by American, American had to pay Southland commissions for two years following termination. If, however, the contract was terminated due to a breach that was not cured, Southland would not be entitled to any commissions. Further, the parties agreed the contract would "immediately terminate in the event either party becomes the subject of a . . . bankruptcy proceeding, is adjudged insolvent, is the subject of an assignment for creditors or receivership proceeding, or is subject to a similar proceeding."

In operation, Southland would seek out customers to whom American could sell castings. The customers would indicate their needs, and Southland would send American a request for quote (RFQ). American would then prepare a quote and have Southland communicate the quote to the customers. Assuming the quote was for a Schedule A or Schedule B account, Southland would receive a commission.

In 2011, Southland obtained approximately $32.5 million in new sales for American—making up approximately 80% of American's total new sales. In comparison, the 2010 year showed just $4.2 million total in new sales. But by March

2012, American CEO Mike Fuller had begun advocating for the replacement of Southland with an internal sales team because he believed American had "outgrown the relationship" with Southland.

In May 2012, one of Southland's sales representatives, Bob Levesque, attended a meeting at American headquarters and accidentally left a notepad in a conference room. An American employee gave the notepad to Fuller. Inside, Fuller discovered quotes from non-Schedule C foundries based in Turkey and Brazil. No one at Southland had asked for written authorization from American to provide these quotes, and no one at American had provided authorization.

Fuller considered these quotes to be a breach of the contract, but he did not mention anything to Southland at that time. Instead, he talked to board members of American's parent company, and, together, they decided to move forward with a plan to organize an internal sales force.

Meanwhile, Southland continued seeking orders on behalf of American. Between May and October 2012, Southland obtained over $24 million in new business for American. At no time between the discovery of the allegedly breaching quotes and October 4, 2012, did American inform Southland of a breach. In fact, the parties amended their contract in August.

On October 4, 2012, however, the Director of Treasury and Risk for American's parent company, Charles Dowling, called Southland's President, Kenneth Crawford, to inform him that American considered Southland in breach of the contract. Fuller also sent Crawford a termination letter, dated October 4. The termination letter stated simply:

> This letter serves as *notice of termination* of the [November 15, 2010] agreement in accordance with Section 11 as a result of [Southland's] breach of Section 5 of the Agreement. Termination will be effective 30

days from today's date. As a result of this termination, [Southland] is not entitled to any continuing commissions under Section 9 of the Agreement after termination.

We remind you of your continuing obligations under the Agreement, including without limitation Section 5[, a continuing duty not to compete for 24 months]. Please contact the undersigned with any questions.

(emphasis added). In response, Crawford repeatedly called, sent text messages to, and emailed Dowling and Fuller to learn the reason for the termination. No one from American responded to these messages.

American paid Southland commissions for another 30 days, until November 3, 2012, at which time American discontinued paying commissions and considered the contract terminated. Southland sued American in Arkansas state court on January 31, 2013, alleging American breached the contract's termination provisions by not providing adequate notice of the breach or the opportunity to cure and by not paying continuing commissions to Southland. Southland asserted it was entitled to continuing commissions under the contract. American removed the case to federal court and alleged Southland had committed an incurable breach such that notice and the opportunity to cure were not necessary.

During discovery, American came to believe Southland had breached the agreement on other occasions in addition to the already known alleged breaches regarding Turkish and Brazilian quotes. Specifically, American believed Southland had used American quotes to aide Southland in obtaining business from a Chinese company. Additionally, American discovered Southland had entered into an agreement with a different domestic foundry that did business with one of American's Schedule A customers.

According to Southland, these actions did not constitute breaches under the contract. Southland explained that the Turkish quote was requested by a customer and

that Levesque had told the customer international quotes would not be competitive with American's quote. Levesque also explained that one of the customer's employees needed additional quotes to demonstrate to his manager that he was exploring all options. Levesque indicated he was operating in American's best interests by providing the international quote to show American was a more economical alternative. Southland also claimed the Brazilian quote found in the conference room did not constitute competition because the quote was for a part that American had declined to quote or produce.

With respect to the alleged breaches discovered during pre-trial litigation, Southland argued the Chinese company was listed in Schedule C, thereby allowing Southland to represent the company. And, regarding the domestic foundry, Southland contended the foundry did not "compete" with American due to the two foundries' differing capabilities.

American moved for summary judgment on Southland's claim. American argued that, under the unambiguous language of the contract, Southland breached the agreement and the breach was so severe that it was incurable. Southland responded by pointing to the term "Products" in the contract and arguing the term's interaction with the noncompete provisions made the contract ambiguous. Southland then argued a jury could conclude that the contract did not prohibit Southland's actions.

The district court denied summary judgment, finding the contract ambiguous and finding jury questions with respect to the meaning of the terms "Products" and "compete." The ambiguity, according to the district court, led to factual questions about whether Southland breached the contract at all. Further factual questions existed with respect to whether American provided adequate notice and whether Southland's alleged breaches were curable.

Trial took place in July 2014, during which the jury heard the facts described above. American moved for judgment as a matter of law, which the district court deferred. The district court instructed the jurors that they would be responsible for "decid[ing] the meaning of the following terms of the contract: 'Products' and 'compete.'" It gave the jury instructions on how to interpret the contract. The district court also provided the jury with an instruction on "incurablity." The district court explained:

> When there is a breach of contract going directly to the essence of the contract, which is so exceedingly grave as to irreparably damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice and right to cure, where the nature of the breach is such that it cannot be reasonably cured.

The district court also instructed the jury on waiver, telling the jury "[a] party is relieved of the duty to perform a contract if the other party to the contract by acts or conduct, indicated an intent not to enforce the contract so that a reasonable person would think that performance of the contract was no longer required."

The jury returned a general verdict in which it found "American Castings breached the contract by terminating it in a manner that did not comply with paragraph 11[, the termination provisions,] of the Manufacturer's Representative Agreement." The jury found American owed Southland approximately $3.8 million in damages based on the commissions for sales during the two-year post-termination period.

American renewed its motion for judgment as a matter of law, and in the alternative, moved for a new trial. The district court denied the motions. American timely appealed.

II

American asserts the district court erred by not granting it judgment as a matter of law. In the alternative, it argues the district court should have granted it a new trial. For the reasons stated below, we affirm.

We turn to American's claims that it was entitled to judgment as a matter of law. We review the denial of a motion for a judgment as a matter of law de novo, and we view the evidence in the light most favorable to the jury's verdict. Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455, 462 (8th Cir. 2013). Because the parties agree Oklahoma law governs the contract, we apply substantive Oklahoma law. See Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 951 (8th Cir. 2012).

To succeed under Oklahoma law, Southland had to demonstrate the parties entered into a contract, American breached that contract, and Southland was injured by American's breach. Dig. Design Grp., Inc. v. Info. Builders, Inc., 24 P.3d 834, 843 (Okla. 2001). The parties agreed the contract was valid, and there was no dispute that Southland was injured by American's alleged breach. The issue for the jury, then, was whether American breached the contract. In support of its argument that it is entitled to judgment as a matter of law, American asserts the contract was unambiguous and under the unambiguous language of the contract, no reasonable jury could find American breached the contract. American argues this is true because Southland committed an incurable breach, so notice and an opportunity to cure was not necessary.

We first address whether the contract was ambiguous. The determination of whether a contract is ambiguous is a question of law, which we review de novo. Winthrop Res. Corp. v. Stanley Works, 259 F.3d 901, 903 (8th Cir. 2001); M.J. Lee Constr. Co. v. Okla. Transp. Auth., 125 P.3d 1205, 1210 (Okla. 2005). Under Oklahoma law, "[a] contract is ambiguous if it is reasonably susceptible to at least two

different constructions." Pitco Prod. Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545–46 (Okla. 2003). To determine whether the contract is ambiguous, we look to the language of the entire contract and give terms their ordinary and plain meaning, unless the parties use a term in a technical sense. Id. at 546.

Here, the contract's opening recital uses the term "Products," and claims that the term is defined in separate schedules attached to the contract. Those schedules, however, do not contain a list of products or a definition of the term. Nor is "Products" defined anywhere else in the contract. The contract then uses "Products" abundantly. Both parties' responsibilities are tied to the "Products" of the manufacturer, and commissions are tied to "Products." The term is open to two interpretations. American argues it applies to all products that are manufactured for Schedule A and B customers, regardless of whether American can, or chooses to, make those products. Southland asserts that "Products" is more limited—although it applies to products manufactured for Schedule A and B customers, it refers only to those products American chooses and has the ability to make for those customers. Both are reasonable interpretations, making the term ambiguous.

American asserts that this ambiguity is immaterial to this case, however, because it has no bearing upon the noncompete clauses contained within the contract. We disagree. Upon reviewing the entire contract, "Products" plays a key role throughout. And, although the noncompete provisions may not specifically reference "Products," the agreement also does not define "compete" or any variation thereof. It is unclear whether Southland was prohibited from competing with the "Products" specifically or whether it was prohibited from dealing generally with other players in the industry. The scope of "compete" and the variations thereof is unclear from the contract. As such, an ambiguity exists.

Because an ambiguity exists, we must turn to extrinsic evidence to determine the intent and meaning of the parties. See Fowler v. Lincoln Cty. Conservation Dist.,

15 P.3d 502, 507 (Okla. 2000). And, under Oklahoma law, "[w]here the meaning of an ambiguous written contract is in dispute, . . . construction of such contract becomes a mixed question of law and fact, and is for jury determination under proper instructions." Id. The district court did not err by submitting the question to the jury.

Finding that the question of contract interpretation was properly in front of the jury, we must determine whether sufficient evidence supported the jury verdict. See Am. Bank of St. Paul, 713 F.3d at 462. Where a contract specifies the manner of termination, the party terminating the contract must adhere to the contract's express terms regarding termination. Osborn v. Commanche Cattle Indus., Inc., 545 P.2d 827, 830 (Okla. Civ. App. 1975); see also Pitco, 63 P.3d at 545 (explaining when a contract is "clear and free of ambiguity," the mutual intent of the contracting parties controls). The termination provision at issue here specifically required written notice of a breach and the opportunity to cure.

There was sufficient evidence that American did not properly comply with the termination provisions of the contract. Even assuming American's notice was adequate—which Southland disputes—the jury could find American did not comply with the cure provision. In the termination letter, American told Southland simply that it believed Southland breached "Section 5 of the Agreement." When a Southland representative called, emailed, and sent text messages to obtain more information about the alleged breach or to discuss a cure, American did not respond or provide Southland an opportunity to cure the alleged breach.

This finding, however, does not end our inquiry. American asserts that it was free from the notice and cure requirements because Southland breached the agreement and the breaches went "directly to the essence of the contract" and were "so exceedingly grave as to irreparably damage the trust between [Southland and American]." In other words, American argued at trial, and continues to assert, Southland's breaches were incurable. Southland argues there was sufficient evidence

-11-

for a jury to find Southland did not breach the contract, and even if Southland breached the contract, it was not so grievous to make a cure impossible.

We need not decide whether there was sufficient evidence for the jury to determine Southland did not breach the contract. We find the jury had sufficient evidence to conclude Southland's breaches were curable. Southland presented evidence to demonstrate that even if its actions constituted breaches of the agreement, the breaches stemmed from mere misunderstandings.

With respect to the Turkish quote, Southland adduced evidence showing the quote was obtained as a courtesy to make a customer happy and was obtained to continue marketing American products to the customer. In fact, Levesque obtained approximately $7 million in business from the customer for American. Regarding the Brazilian quote, Southland reasonably understood—perhaps incorrectly—American was not interested in manufacturing the part. Southland also presented testimony that it did not consider any of the Chinese quotes competition because the Chinese company was on Schedule C—the listing of grandfathered companies with which Southland had previously done business. With respect to alleged violations of confidential information, there was evidence tending to show quotes from various companies were industry norm. Finally, when dealing with the other domestic foundry, Southland demonstrated evidence tending to show the foundry was not a competitor to American because the two foundries produced different products.

Perhaps most telling that cure was possible is the fact that American and Southland continued to have a fruitful relationship even after American discovered the alleged breaches in May 2012. Southland continued to deliver RFQs to American for an additional four and a half months. These RFQs eventually generated tens of millions of dollars in business for American.

There was sufficient evidence in the record for a jury to conclude Southland's alleged breaches were misunderstandings of the contract, not intentional violations that necessarily destroyed all trust. To the extent any harm outside of a lack of trust occurred to American, Southland could have cured the alleged breaches through monetary means.

American also argues it is entitled to a new trial. We review the denial of a motion for a new trial for an abuse of discretion. Hiser v. XTO Energy, Inc., 768 F.3d 773, 776 (8th Cir. 2014). American argues the district court inappropriately instructed the jury on waiver.[3] We review jury instructions for an abuse of discretion. Stanely v. Cottrell, Inc., 784 F.3d 454, 462 (8th Cir. 2015). We look at the totality of the instructions to determine whether there was error. See id. In light of the district court's instruction on incurability and in light of the evidence presented at trial, the district court did not err by instructing the jury on waiver. There was evidence to show American learned of a breach and decided to ignore the breach. American argues the instruction was improper because it was not fully informed of all breaches at the time it supposedly waived performance. However, whether American would have terminated the contract earlier if it had the benefit of this additional knowledge was a question for the jury. The jury could have found that American would not have reacted any differently even if they had known of additional breaches. The district court did not abuse its discretion by including a waiver instruction.

American also argues it is entitled to a new trial because the district court allowed parol evidence beyond what was required to define "compete" and "Products." American did not object to any such evidence, so we review for only

---

[3]To the extent American asserts the jury instructions were flawed due to ambiguity-related instructions, we find no error by the district court. For the reasons described above with reference to American's motion for judgment as a matter of law, the contract was ambiguous, and the instructions were proper.

plain error.  <u>See</u> <u>Schaub v. VonWald</u>, 638 F.3d 905, 925 (8th Cir. 2011).  Upon review of the record, we find no plain error.

The district court did not err by denying American judgment as a matter of law, nor did it abuse its discretion by denying a new trial.  The judgment of the district court is affirmed.

_____